State v. Bartley.

39   353
46   719

State of Nebraska, ex rel. First National Bank of Crete, v. Joseph S. Bartley, State Treasurer.

Filed February 20, 1894.   No. 6709.

1. **Construction of Statutes.** In construing a statute effect must be given, if possible, to every word, clause, and sentence therein. In other words, a statute should be so construed as to make all its parts harmonize with each other and render them consistent with its general scope and object.

2. The term "several current funds," as employed in section 1 of the act of the legislature of 1891, entitled "An act to provide for the depositing of state and county funds in banks," construed to mean all the moneys belonging to the state in the possession or under the control of the state treasurer.

3. **Funds of State Treasury.** The subject-matter of said act, and the obvious scope and purpose of its many provisions, leave no room for doubt that the legislature intended the statute should apply alike to each of the different funds of the state treasury.

4. **Where money is deposited in a bank,** on an open account, subject to check of the depositor, and not received as a special deposit, the bank agreeing to pay interest on the money, the transaction, although called a "deposit," is in substance and legal effect a loan. *State v. Keim*, 8 Neb., 63, followed.

5. **Investment of Educational Funds.** Under section 9, article 8, of the state constitution, moneys belonging to the several permanent educational funds of the state cannot be "invested or loaned except on United States or state securities, or registered county bonds."

6. **The depositing in banks of public funds,** under the provisions of the depository law, constitutes a loan and investment of the moneys so deposited.

7. **Constitutional Law:** PERMANENT EDUCATIONAL FUNDS: DEPOSIT IN BANKS. *Held,* That the said law, in so far as it requires the depositing of the moneys belonging to the permanent educational funds of the state in banks, contravenes section 9, article 8, of the constitution, and said law is inoperative as to said funds.

27

State v. Bartley.

ORIGINAL application for *mandamus*.

*James W. Dawes,* for relator.

*W. S. Summers* and *John H. Ames, contra.*

NORVAL, C. J.

This is an application by the relator, the First National
Bank of Crete, for a peremptory writ of *mandamus* to
Joseph S. Bartley, state treasurer, to compel respondent to
deposit with relator a portion of the moneys in the state
treasury, according to the requirements of the act passed
by the state legislature of 1891, entitled "An act to pro-
vide for the depositing of state and county funds in banks."
The petition charges, in substance, that on the 9th day
of January, 1894, the governor, attorney general, and sec-
retary of state, in pursuance of the provisions of said act,
designated the First National Bank of Crete as a state de-
pository, and on said day said bank executed and delivered
a bond conditioned as required by said law, which bond,
and the sureties thereon, were duly accepted and approved
by the proper officers; that only three other banks have
complied with the provisions of said act of the legislature
so as to entitle them to the deposit of state funds, and that
the amount of the bonds furnished by each of said other
banks was, and is, $100,000, so that the aggregate amount
which the respondent is authorized at any time to have
on deposit in all of said banks pursuant to said act is
$150,000; that respondent has refused to deposit any of
the moneys now in the state treasury with the relator, al-
though requested so to do; that respondent, at the time of
such demand and refusal, stated that all the moneys belong-
ing to the state which he is empowered by said act to deposit
were already deposited in the said several banks, except
moneys belonging to the following funds: sinking, relief,
permanent school, temporary school, permanent university,
library, agricultural college endowment, normal school en-

dowment, temporary university, normal school interest, and saline. The petition further charges that respondent refuses to deposit in relator's bank any of the moneys belonging to either of the above enumerated funds, although the amount in his possession and belonging to any one of said funds, added to the amount on deposit by said treasurer with the said other banks, exceeds in the aggregate the sum of $150,000, and that the sole reason given by the respondent for his refusal to deposit in the bank of the relator any of the moneys in the above mentioned funds was, and is, that none of said moneys are "current funds" within the meaning of the said depository law. The cause was submitted on a general demurrer to the petition.

The first question in this case is one of construction to be given to the act above mentioned relating to the deposit of public moneys in banks. Was it the intention of the legislature to require all moneys coming into the state treasury to be deposited, or only a certain portion thereof? Sections 1 and 2 of said act, chapter 50, Laws of 1891, are in these words:

"Section 1. The state treasurer shall deposit, and at all times keep in deposit for safe keeping, in the state or national banks, or some of them doing business in the state, and of approved standing and responsibility, the amounts of money in his hands belonging to the several current funds in the state treasury, and any such bank may apply for the privilege of keeping on deposit such funds or some part thereof; all such deposits shall be subject to payment when demanded by the state treasurer on his check, and by all banks receiving and holding such deposits as aforesaid, shall be required to pay, and shall pay to the state for the privilege of holding any such deposit not less than three per cent per annum upon the amounts so deposited, as hereinafter provided, and subject also to such regulations as are imposed by law, and the rule adopted by the state treasurer for receiving and holding such deposits.

"Sec. 2. The amount to be paid by any and all banks under the provisions of this act, for the privilege of keeping public funds on deposit, shall be computed on the average daily balances of the public moneys kept on deposit therewith, and shall be paid and credited to the state quarterly. on the first days of January, April, July, and October of each and every year, and the treasurer shall require every such depository to keep separate accounts of such several funds of the state as may be deposited, showing the name of each fund to which the same belongs and the amounts and sums paid to the state for the privilege of keeping the same on deposit as aforesaid, and to each of said funds respectively shall be credited directly to the account of the fund or funds so held on deposit, in proportion to the amount of such funds so held."

By section 3 each bank designated as a depository under the act is required to give a bond for the safe keeping and payment of all deposits and the accretions thereof, conditioned that it will render each month to the state treasurer a statement, in duplicate, showing the several daily balances, and the amount of state moneys held by it during the month, the amount of the accretions thereof, how credited separately, and for the payment of the deposit and the accretions accruing thereon, upon the presentation of the check of the state treasurer, and also that such depository will faithfully discharge the trust and comply with the provisions of the act. The section further provides the form of the bond, names the officer with whom the same shall be deposited, and forbids the treasurer having on deposit in any bank, at one time, moneys exceeding one-half of the penalty of the bond.

Section 4 provides: "The making of profit, directly or indirectly, by the state treasurer, out of any money in the state treasury belonging to the state, the custody of which the state treasurer is charged with, by loaning, depositing, or otherwise using it, or depositing the same in

any manner, or the removal by the state treasurer, or by his consent, of such moneys, or a part thereof, out of the vault of the treasurer's department, or any legal depository of the same, except for the payment of warrants legally drawn, or for the purpose of depositing the same in the banks selected as depositories under the provisions of this act, shall be deemed guilty of felony, and on conviction thereof shall be subject to punishment in the state penitentiary for the term of not more than two years, or a fine not exceeding five thousand ($5,000) dollars, and shall also be liable under and upon his official bonds for all profits realized from such unlawful using of such funds. And it is hereby made the duty of the state treasurer to use all reasonable and proper means to secure to the state the best terms for the depositing of the money belonging to the state, consistent with the safe keeping and prompt payment of the funds of the state when demanded."

The next section prescribes the penalty for the willful failure or refusal of the state treasurer to comply with the provisions of the act.

Counsel for the relator insists that it is the duty of the state treasurer to keep on deposit in the several banks designated as depositories all money received by him belonging to the state, while the respondent contends that the moneys belonging to what is commonly known as the "general fund," a fund created for the purpose of paying the salaries of the state officers and defraying the general expenses of the state government, are the only moneys to which the depository act applies. The principal controversy in the case is as to the meaning of the term "several current funds" as used in the section first above quoted. The decisions of the courts of other states do not aid us in our investigation. In fact, we have been unable to find a law upon the statute book of any state, relating to the deposit of public moneys in banks, precisely like our own. In most of the states having a depository law the treasurer

is either required by express enactment to deposit all moneys
that shall come into his hands, or else the statute specific-
ally enumerates what funds shall be deposited in banks.
Of course, the phrase "current funds," as employed in com-
mercial transactions, has a fixed, known signification. Thus,
these words as used in notes or bank checks have been fre-
quently defined by various courts as meaning current
money; lawful money; par funds, or money circulating
without any discount. (See *Galena Ins. Co. v. Kupfer*, 28
Ill., 332; *Wharton v. Morris*, 1 U. S., 125; *Hulbert v.
Carver*, 40 Barb. [N. Y.], 245; *Phœnix Ins. Co. v. Allen*,
11 Mich., 501; *American Emigrant Co. v. Clark*, 47 Ia.,
671.) All will agree, we think, that the phrase "current
funds" was not employed by the legislature in enacting the
statute under consideration in the same sense in which that
term is used in commercial dealings. The term "current
funds," like many other words in our language, is suscep-
tible of more than one meaning. Where a word is em-
ployed in a contract or statute which has different mean-
ings, the sense in which it is used is to be gathered from
the context. It is an elementary rule of construction that
effect must be given, if possible, to every word, clause, and
sentence of a statute. In other words, a statute must receive
such construction as will make all its parts harmonize with
each other and render them consistent with its general scope
and object. (*Follmer v. Nuckolls County*, 6 Neb., 204; *State
v. Babcock*, 21 Neb., 599.) If we apply the foregoing rule
in the interpretation of the law under consideration, it is
not a difficult task to ascertain the legislature's intent.

It should be remembered that the moneys which come
into the state treasury from time to time are, either by con-
stitutional provision, or by legislative enactments, applicable
to a variety of objects, and are divided into several sepa-
rate and distinct funds, according to the sources from which
they are derived and the uses to which the same may be
devoted. We know at the time this law was enacted that

there were several of these funds, each having a well-understood and appropriate name, as the general fund, sinking fund, permanent school fund, and others which it is unnecessary to stop now to enumerate. It is obvious, therefore, that the words "several current funds" were employed by the legislature with reference to the various designations or divisions of the public moneys of the state. Manifestly the construction placed upon the provisions of the statute by respondent's counsel is entirely too narrow and strained, and should not obtain. To adopt it would violate the rule above stated for the construction of statutes, which requires that some meaning, if possible, must be given to every word in the act, since the construction insisted upon cannot prevail unless we attach no meaning to the word "several" in the above phrase of the first section of the law. The statute declares that "the amounts of money in his hands belonging to the several current funds in the state treasury" shall be deposited. This language was without doubt intended to apply to more than one fund. This is manifest by the use of the plural of the word "fund" and the employment of the adjective "several." It certainly could not have been the intention of the law-makers that the moneys belonging to one fund alone should be kept on deposit with some designated depositary. If they did, they were very unfortunate in the use of language. Had it been the intention of the legislature that the act should apply to a single fund, it is fair to assume that language which could not be misunderstood would have been employed to express such purpose. But it is said that the word "current," in the connection in which it is used with the word "funds," indicates that the moneys which the law-makers intended are those raised by taxation, and which are devoted to defraying the current expenses of the state government by disbursements from what is known as the "general fund," and in the same connection reference is made to the definition of the word

"current." In the Century Dictionary it is defined thus: "Running; moving; flowing; passing; present in its course; as, the current month or year." Other standard authorities give the word about the same definition. Assuming that the word was employed by the legislature in the sense indicated, yet the interpretation contended for by respondent is not permissible. While the amount of money belonging to the general fund of the state is continually changing or fluctuating, caused by the paying of the revenues derived from taxation into the treasury, and by their being disbursed, it is likewise true that the amount in each of the other different funds in the treasury is constantly changing, as the records kept by the treasurer and auditor, respectively, will disclose, and of which public records this court is bound to take judicial notice.

We do not entertain a doubt as to the sinking fund, relief fund—which is also a sinking fund, and the permanent educational funds, the moneys in each of which, counsel strenuously insist, are not "current funds" within the meaning of the law. The sinking and relief funds, now aggregating about a quarter of a million of dollars, consist of moneys derived from taxes levied for the purpose of paying the interest on outstanding bonds issued by the state, and for the purpose of paying the principal of said bonds when they become due. The moneys constituting these two funds are collected and paid into the treasury, from time to time, precisely the same as the taxes are collected and paid into the general fund. The interest on one set of the bonds is paid by the state treasurer annually and the other semi-annually.

The permanent school fund, permanent university, normal school endowment, and agricultural college endowment funds constitute the permanent educational funds of the state. The permanent school fund is composed of the proceeds of the sale of land by the state, and of the redemption of United States and state securities and county bonds

belonging to said fund, and of escheated estates, and a five
per centum granted by congress on the sale of government
lands in the state.    Each of the other educational funds is
composed of the proceeds of lands which have been set
apart for that purpose and sold by the state, and the re-
demption of securities belonging to said funds respectively.
Each of these several funds is continually augmented by
moneys received from the sources indicated, and the moneys
therein are diminished from time to time by the making of
investments for the benefit of said funds.    Hence, the sev-
eral educational funds are " current funds " in the sense in
which that term is used in the law, if the moneys compos-
ing the general fund fall within the definition, and all con-
cede that the law applies to the fund last named.    In the
language of counsel for relator, " For the purpose of the
business of a great state all funds are current funds so long
as they remain on hand, or not invested.    Shall we, by the
use of jugglery of language, extend the provisions of this
law to the pittance of the general fund, as we often find it,
and deny them to the sacred trust funds of the state?
*    *    *    These trust funds are current, in that they
should have, and in that they demand, constant attention,
hourly, daily, all the time, looking to their profitable, per-
manent investment.    These trust funds are current, mov-
ing, and changing funds, increasing and diminishing."

In respect to two of the other funds of the state treasury,
the temporary school and temporary university, which ag-
gregated at the close of the last year more than $360,000,
it may be observed that the former is derived from a
tax levied and collected at the same time as other state
taxes for the support of the common schools of the state,
together with the interest and rentals accruing from the sale
and lease of school lands, and the interest received from the
investments made for the benefit of the permanent school
fund.    The temporary university fund is supplied from a
tax levied for the support of the state university, which is

likewise paid at the same time other taxes are collected, and by moneys received from the interest and rentals of lands belonging to the university endowment fund, sold and leased by the state, together with the interest on securities belonging to said fund, and tuition fees. The moneys composing the temporary school and temporary university funds are paid into the state treasury as often as the moneys constituting any other fund of the state are paid in, and more frequently than the moneys belonging to the general fund. The moneys composing the temporary school fund are apportioned among the counties every six months, and are paid upon warrants upon the state treasury drawn by the auditor. The moneys belonging to the temporary university fund are disbursed from time to time upon the auditor's warrant. Both of these are moving funds, so to speak, and the balances therein are constantly increasing and diminishing.

There is no word or provision in the act we are discussing which directly in terms, or by fair implication, limits the operation thereof to the moneys of the state belonging to one fund more than another. On the contrary, the subject-matter of the act, and the obvious scope and purpose of its provisions, conclusively show it was the intention of the legislature that the statute should apply to all funds of the state alike. An examination of the provisions of the second and fourth sections of the law strengthens this conclusion. By the second section it is made the duty of every bank designated as a depository "to keep separate accounts of such several funds of the state as may be deposited, showing the name of the fund to which the same belongs and the amounts and sums paid to the state for the privilege of keeping the same on deposit as aforesaid, and to each of said funds respectively shall be credited directly to the account of the fund or funds so held on deposit, in proportion to the amount of such fund as held." There is no ambiguity in this provision. Plainer language could

not have been used.   It shows that the moneys in the several funds were to be deposited, and that the depositary should keep a separate account with each fund.   The fourth section, which we have quoted above, makes it the duty of the state treasurer to make every reasonable effort to secure to the state the best terms for the depositing of "the money belonging to the state," and it is also made a felony for such officer to make any profit out of any money in the state treasury belonging thereto, by loaning, depositing, or otherwise using or disposing of it; and the removal of such money, or a part thereof, by the treasurer, or with his consent, out of the vaults of the treasury, or any legal depository, except for the payment of warrants, or for the purpose of depositing in the banks legally selected as depositories, is also declared a felony.   Whether or not this section is legal and valid as a criminal statute is not now involved and will not be decided.   Its consideration, however, tends to show the purpose and object of the legislature in enacting the law, and that the power to deposit all the moneys in the state treasury for the benefit of the state was meant to be conferred, and we think it has been, in plain terms, so far as the legislature possessed the power to do so.

This brings us to the consideration of another question, and that is, whether the act which we have been considering is unconstitutional in so far as it requires the deposit in banks the moneys in the treasury belonging to the several educational funds of the state.   Section 9 of article 8 of the constitution of Nebraska reads as follows: "All funds belonging to the state for educational purposes, the interest and income whereof only are to be used, shall be deemed trust funds held by the state, and the state shall supply all losses thereof that may in any manner accrue, so that the same shall remain forever inviolate and undiminished; and shall not be invested or loaned except on United State‹ or state securities, or registered county bonds of this state; and such funds, with the interest and income

thereof, are hereby solemnly pledged for the purposes for
which they are granted and set apart, and shall not be
transferred to any other fund for other uses." The fore-
going provision prohibits the loaning or investing of any
moneys belonging to any of the permanent educational
funds of the state, "except on United States or state secu-
rities, or registered county bonds of this state." The moneys
in these several funds the constitution has impressed with
a trust character, and the legislature is powerless to author-
ize them to be devoted to any purpose not within the scope
of the constitutional provision quoted. Does the statute
attempt to authorize the loaning or investing of these trust
funds? Counsel for relator contends that it does not; that
it merely requires their deposit temporarily for safe keeping,
pending need for use or opportunity for permanent invest-
ment. This construction would be a reasonable and proper
one if the deposit contemplated by the statute was a special
one merely for safe keeping, and that the same identical
money should be returned. But this is not the kind of
deposit the legislature meant. If it was, the purpose is
not indicated in the title of the act, since it makes no ref-
erence to the safe-keeping of the funds deposited in banks.
It is manifest, from an examination of the entire act, that
a general deposit of the funds was what the framers in-
tended. True, the first section declares that "the state
treasurer shall deposit, and all times keep in deposit for safe
keeping," in the banks that shall be designated as deposi-
tories, the moneys in his hands belonging to the several
current funds, subject to payment on the treasurer's check;
but further along, in the same section, the bank receiving
and keeping such deposit is required to pay the state not
less than three per cent per annum upon the amounts so
deposited; and the next section provides, among other
things, in substance, that the interest shall be computed on
the average daily balances of the public moneys kept on
deposit. While the statute mentions "safe keeping," when

the several provisions are construed together it is quite clear that the transaction contemplated does not amount to a special deposit. Whoever heard of that kind of a deposit of money being paid out on checks, or of a banking institution paying for the privilege of holding a special deposit of funds? The identical moneys deposited are not required to be returned. Obviously the bank receiving them had the right to use and control the money as its own. It could loan the funds for the purpose of earning the money with which to pay the stipulated interest due the state. A deposit of state funds, under the provisions of the law, amounts to a loan or investment of the funds so deposited.

As was said by Mr. Justice Miller in his opinion in *Marine Bank v. Fulton Bank*, 2 Wall. [U. S.], 256, "All deposits made with bankers may be divided into two classes, namely, those in which the bank becomes bailee of the depositor, the title to the thing deposited remaining with the latter, and that other kind of deposit of money peculiar to banking business, in which the depositor, for his own convenience, parts with the title to his money, and loans it to the banker, and the latter, in consideration of the loan of the money and the right to use it for his own profit, agrees to refund the same amount, or any part thereof, on demand."

The decisions are quite uniform to the effect that where money deposited in a bank is passed generally to the credit of the depositor, the relation of debtor and creditor is thereby created, and the transaction, although called a "deposit," is nevertheless in substance and legal effect a loan, and this though it is payable on demand. (*Commercial Bank of Albany v. Hughes*, 17 Wend. [N. Y.], 100; *Perley v. County of Muskegon*, 32 Mich., 132; *State v. Executor of Buttles*, 3 O. St., 309; *Ætna Nat. Bank v. Fourth Nat. Bank*, 46 N. Y., 82; *Lowry v. Polk County*, 51 Ia., 50; *Long v. Emsley*, 57 Ia., 11; *In re Franklin Bank*, 1 Paige Ch. [N. Y.], 249; *Wray v. Tuskegee Ins. Co.*, 34

Ala., 58; *Bank v. Jones*, 42 Pa. St., 536; *Knecht v. United States Savings Institution*, 2 Mo. App., 563.)

In *Foley v. Hill*, 2 H. L. Cases [Eng.], 28, Lord Chancellor Cottenham said: " Money when paid into a bank ceases altogether to be the money of the principal. It is then the money of the banker, who is bound to return an equivalent by paying a similar sum to that deposited with him when he is asked for it. The money paid into the banker's is money known by the principal to be placed there for the purpose of being under the control of the banker; it is then the banker's money; he is known to deal with it as his own; he makes what profit of it he can, which profit he retains to himself, paying back only the principal, according to the custom of bankers in some places, or the principal and a small rate of interest, according to the custom of bankers in other places. The money placed in the custody of a banker is, to all intents and purposes, the money of the banker, to do with it as he pleases; he is guilty of no breach of trust in employing it; he is not answerable to the principal if he puts it into jeopardy, if he engages in a hazardous speculation; he is not bound to keep it or deal with it as the property of his principal, but he is, of course, answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into his hands. That has been the subject of discussion in various cases, and that has been established to be the relative situation of banker and customer. That being established to be the relative situations of banker and customer, the banker is not an agent or factor, but he is a debtor."

The Ohio case was this: The Ohio canal fund commissioners deposited with the Columbus Insurance Company $100,000 of the money and funds of the state, belonging to the canal fund, and in consideration of which the company gave a bond, signed by various persons, to repay the

same in two years with seven per cent interest thereon per annum, payable annually. In an action by the state upon the bond, the court held that the advancement of the money to the insurance company was a loan, although the bond denominated the receipt of the money as a "deposit."

In *State v. Keim,* 8 Neb., 63, this court held that the deposit of state moneys by a state treasurer in a bank was a loan in its legal effect. This case was cited with approval in *First Nat. Bank of South Bend v. Gandy,* 11 Neb., 431.

It is urged that the Nebraska cases cited do not apply to the questions here at issue, since at the time they arose no law was in existence which required the deposit of public funds in banks, while now the treasurer is not only authorized to deposit them for safe keeping, but he is expressly commanded to do so. We are unable to see the force of the argument. The fact that the legislature has enacted that state moneys shall be deposited in banks does not make the placing of the funds therein any the less a loan than had they been deposited without sanction of law. On the contrary, it would seem that the two cases decided by our own court are the more valuable as precedents for our now holding that such a transaction amounts in law to a loan, since we have a statute which authorizes the deposit of public funds, and in every case of deposit, this statute enters into and forms a part of the contract.

Connecticut has a statute which declares that where the real estate of a married woman has been sold and the proceeds thereof "secured or invested in her name, or in the name of a trustee for her benefit, the same shall * * * not be liable to be taken on execution for the debts or liabilities of her husband." The supreme court of that state, in *Jennings v. Davis,* 31 Conn., 134, held that where the money received by the wife from the sale of her lands is deposited in her name in a bank, it is invested within the meaning of the statute. Sanford, J., in deliv-

ering the opinion, observes: "It is not stated whether the
money was deposited in the bank for safe keeping merely,
or in the character of a loan to the bank for which a stipu-
lated rate of interest was to be paid during its continuance
there; nor is it material to inquire, because, in either case,
the deposit (being a general as contradistinguished from a
special one) created a debt in favor of the depositor and
against the bank, and then the money became 'invested' in
that debt, and being thus invested in the name of Mrs.
Morehouse was protected by the statute against her hus-
band's claims upon it.  *   *   *   It can make no difference
whether the depositor took any written evidence of this
investment or did not.  The statute does not require any
particular species of evidence that the investment has been
made; it only requires that it should be made in her name,
or in the name of a trustee for her benefit.  Money loaned
is 'invested' in a debt against the borrower.  If a prom-
issory note is taken for it in the lender's name, the note be-
comes the evidence of the investment and secures it to the
lender.  If no note is taken, the money is nevertheless
'invested' in the debt against the borrower and in the
lender's name."

The conclusion is irresistible that the framers of the law
under review contemplated that the moneys deposited in
pursuance of the provisions thereof should be retained by
the bank receiving the same for an indefinite period of time
and be used and loaned by it as its own, the bank being
under obligation to repay the amount so deposited on the
presentation of the check of the state treasurer.  There is
no room for doubt that where money is deposited under
this act, the bank receiving the same is not a bailee, which
would be the case if the title to the money remained in the
state after the same was received by the bank.  Prior to
the adoption of the present statute there existed in this state
no law authorizing or requiring the deposit of public funds
in banks.  It was, however, generally understood that each

of the former state treasurers had loaned the state funds to various banking institutions of the state for his own pecuniary benefit. The state received no income from such use of its moneys, and it was to remedy this that the depository law was enact·l, rather than to provide for the safe keeping of the moneys belonging to the state treasury. The clear and manifest object of the statute was to enable the state to receive interest on its funds deposited in banks. The transaction contemplated by the statute is as much a loan or investment of the moneys deposited under its provisions as where a bank loans its moneys on the note of its customer; and if this law can be upheld, so far as it relates to the depositing of the permanent educational funds in banks, then there is nothing to prevent the legislature from enacting a law authorizing the loaning of the educational or trust funds to its citizens with or without security for the repayment thereof; and all will agree that such a law, if enacted, would contravene the section of the constitution above quoted. But it is said that the constitution does not say that these educational funds shall not be temporarily deposited in banks until opportunity for their permanent investment is presented. That instrument in express terms forbids their being "loaned or invested" except in a certain manner, and, as we have already attempted to show, the depositing of these moneys in banks on open account drawing interest, although deposited temporarily, constitutes a loan and investment of the money. The fact that a person borrows money for an indefinite period, payable on demand of the lender, does not make the transaction any the less a loan than if the money had been taken for a fixed, long period of time. The same is equally true as regards the depositing of money in banks. The length of time the money is left does not determine whether the transaction is a loan or not. We are satisfied, both from reason and upon authority, that the depositing of the moneys belonging to the permanent educational fund of the state in banks under

28

the provisions of the depository law is, in effect, a loan and investment of the funds so deposited, and is, therefore, inhibited by the constitution. We do not wish to be understood as in the least intimating that the legislature is powerless to enact a law requiring the state treasurer to deposit the moneys belonging to these funds in a bank or banks for safe keeping merely. Perhaps it has that power, but such is not the scope and effect of the law before us, since it requires a general deposit of the funds and not a special deposit, where the identical moneys deposited are to be returned. The amount of uninvested moneys belonging to the several permanent educational funds of the state is large, and opportunities for the permanent investment of these moneys in the class of securities and bonds described in the constitution are daily becoming less frequent, so that the amount in the treasury belonging to these trust funds is constantly increasing. That they should be invested so that they will yield an income to the state, no one will deny; but the remedy, in part at least, must come through an amendment of the constitution. The courts cannot, under the guise of interpretation, extend the powers conferred by the constitution beyond the scope of its provisions.

We have not considered, nor do we now determine, whether the relator has such an interest as entitles it to maintain the action, since its right to do so has not been raised or argued by counsel. As the state at large is directly interested in the enforcement of the depository law, the attorney general could, and doubtless it is his duty to, institute proceedings to compel the depositing of the funds in the banks designated as depositories; and perhaps a bank which has complied with the law might do so, at least in case the attorney general should refuse to appear and file the application. As it is important to the public interests that the real questions involved in this controversy should be determined and set at rest, we have thought it necessary

to pass upon the merits of the case, without going into the question of who should have instituted the proceedings. It follows, from the views expressed in this opinion, that the demurrer to the application should be overruled and a peremptory writ of *mandamus* allowed.

WRIT ALLOWED.