IN RE STATE TREASURER'S SETTLEMENT.

FILED MARCH 18, 1897. No. 9020.

1. **Parliamentary Law: PROCEEDINGS OF BOARDS.** The rule is well settled that, where authority is conferred by law upon three or more persons to execute a public trust or agency, and in the execution thereof all are assembled to deliberate, or had notice and opportunity to be present, the act of a majority is binding unless the statute expressly requires the concurrent action of all.

2. **State Depositories: BONDS: APPROVAL.** To constitute a bank a state depository of public funds it must give a bond for the safe keeping and payment of such deposits and the accretions thereof, conditioned as required by law, and approved by the governor, secretary of state, and attorney general, or any two of them, where all were present and conferred upon the subject.

3. ———: **EXCESSIVE DEPOSIT: LIABILITY OF SURETIES.** The depositing by a state treasurer of public funds in a state depository bank in excess of one-half of the amount of the penalty of the bond given by said bank will not have the effect to release either the princi-

pal or sureties from their obligation to repay the moneys deposited to the amount of fifty per centum of the bond and the accretions thereof.

4. ————: DEPOSIT BY TREASURER. A deposit of public moneys by a state treasurer in a legally constituted depository for public funds, in compliance with the provisions of the depository law, is in substance and legal effect a loan of the moneys so deposited.

5. ————: ————: TURNING OVER FUNDS. Public funds so deposited and remaining in a state depository at the termination of the office of a state treasurer, he is not required to withdraw therefrom and physically deliver the possession thereof to his successor in office.

6. ————: VALIDITY OF STATUTE. The state depository law is not amendatory of subdivision 8, section 2, article 4, chapter 83, Compiled Statutes, in such a sense as to render it inimical to section 11, article 3, of the constitution.

SUBMISSION of controversy relating to settlement between the outgoing state treasurer and his successor in office. *Opinion.*

*John H. Ames,* for J. S. Bartley.

*C. J. Smyth, Attorney General,* and *Ed P. Smith, Deputy Attorney General,* for J. B. Meserve.

NORVAL, J.

This is a submission to this court without action, under the provisions of section 567 of the Code of Civil Procedure, upon an agreed statement of facts, accompanied with the necessary affidavit of merit, of a controversy between J. S. Bartley, late state treasurer, and J. B. Meserve, his successor in office, to determine matters of difference relating to the settlement between the outgoing treasurer and the incoming officer. The stipulation of facts discloses that at the expiration of said Bartley's term of office certain of the current funds belonging to the state were on deposit in a number of state and national banks, all but four of which then, as well as at and prior to the depositing of the moneys therein by said Bartley, it is conceded, were duly constituted state depositories under and in pursuance of the provisions of the

act of the legislature entitled "An act to provide for the depositing of state and county funds in banks," the same being chapter 50, Laws, 1891 (Compiled Statutes, ch. 83, art. 13, secs. 3a-3g); that the other four banking institutions doing business within the state, to-wit, First National Bank of Plattsmouth, First National Bank of Lincoln, First National Bank of Greenwood, and the Buffalo County National Bank of Kearney, for the purpose of complying with the provisions of said law and constituting them state depositories to hold state moneys, each had given to the state a bond in due form, which had been approved by the secretary of state and attorney general alone and not by the governor, although he was present at the time the decision to approve said bonds was made; that said Bartley deposited in each of certain of the state depositories which had given bonds as required by law more than fifty per centum of the amount of the bond given by it, and that said Bartley refuses to withdraw from each and all of the several state depositories, and physically deliver to said Meserve, any of the current funds of the state on deposit therein.

The following questions are presented for our consideration and adjudication:

1. Is a bond conditioned and signed as by law required, which has been approved by the secretary of state and attorney general alone, and afterwards deposited in the office of the auditor of public accounts, sufficient to constitute the bank giving such bond a state depository, within the meaning of the act to which reference has been had, or is the approval of the governor indispensable to the validity of such bond, he having met with the secretary of state and attorney general for the purpose of considering, and did consider, such bond, and was present when the decision to approve the bond was reached, but dissented therefrom?

2. Did the fact that said Bartley deposited in a lawful state depository moneys of the state in excess of fifty per centum of the penalty of the bond given by such bank

release the principal or sureties on said bond as to the fifty per centum thus deposited?

3. Are the current funds duly deposited by a state treasurer, in accordance with law, in regularly constituted state depositories, and which remained on deposit therein at the time of the expiration of the term of such officer, to be considered and regarded as in the state treasury in such a sense as that the said funds are not required by law to be produced by the outgoing treasurer and the physical possession thereof delivered to his successor in office?

Attention will be given to these propositions in the order in which they have been stated. Section 1 of the legislative enactment already mentioned, known as the "Depository Law," provides, *inter alia*, for the depositing and keeping on deposit, in banks of approved standing, moneys belonging to the several current funds in the state treasury. Section 3 declares that "for the security of the funds so deposited under the provisions of this act the state treasurer shall require all such depositories to give bonds for safe keeping and payments of such deposits and accretions thereof, which bond shall run to the people of the state of Nebraska, approved by the governor, secretary of state, and attorney general." The section prescribes the conditions which the bond shall contain, and sets out the form of the bond, after which the section reads thus: "The treasurer shall not have on deposit in any bank at any one time more than one-half of the amount of the bond, given by said bank, said bond shall be deposited with and held by the state auditor." It will not escape notice that by the portion of the section above quoted the governor, secretary of state, and attorney general are the three persons designated by their names of office to approve the bonds of state depositories, and that as to the bonds given by four of the banks claimed to be such depositories, but two of the three officers designated in the law joined in their approval. The present state treasurer insists that it was

indispensable to a valid execution of the authority conferred, that all three of the officers named should act together and all concur in exercising such power. It is a familiar rule of law, and one which has been applied in numerous cases, that where a body or board is constituted by law to decide upon matters of public interest, in the absence of a provision to the contrary, a majority of its members may act, if all were present and consulted, or at least were duly notified of the time and place of meeting. In such case the act of the majority is the act of the body. (*People v. Coghill*, 47 Cal., 361; *State v. Wilkesville Township*, 20 O. St., 288; *Ex parte Rogers*, 7 Cow. [N. Y.], 526; *State v. James*, 4 Wis., 408; 19 Am. & Eng. Ency. of Law, 465, and numerous authorities there cited.) In note 1 on page 466 of the last authority it is said: "The dispatch of public business is not to be prevented, and the interest of the public is not to suffer, because one or more members after being notified are unable to attend. If all have been duly notified, it is a meeting of all the persons, and if a majority of the whole number attend, it is competent for that majority to do any act, or exercise any power conferred by law to the body collectively, as respects those who cannot, who neglect to, or who refuse to attend, it is the same as if they had attended and dissented from the act of those who were present." The same doctrine has been recognized and applied in *People v. Peters*, 4 Neb., 254, *Hopkins v. Scott*, 38 Neb., 661, and *State v. Bemis*, 45 Neb., 724. In the case last cited there was under consideration section 145, chapter 12a, Compiled Statutes, 1895, entitled "Cities of the Metropolitan Class." This section provides for the appointing of a board of fire and police commissioners for each city of the metropolitan class "by the governor, commissioner of public lands and buildings, and attorney general, sitting as an appointing board, of which the governor shall be *ex officio* chairman." In pursuance of said provision, the last two officers named, sitting as a board, previous notice of the meeting having been given to the governor, but

who refused to attend, appointed three fire and police commissioners for the city of Omaha. This court held the action of the two state officers as binding as if each member of the board had participated and joined in the making of the appointment. The present chief justice, in the course of his opinion in that case, observed: "It is argued that the concurrent action of the three state officers named in the act is essential to a valid appointment thereunder, hence the selection of the new board at such meeting in the absence of the governor is without authority and void; but to that proposition we cannot give our assent. On the contrary, it is clear that the presence and participation of the governor was not indispensable, he having been notified of the meeting and requested to attend. The action of the majority is, under the circumstances, the action of the board, and equally binding as if all had attended and expressly assented thereto." After citing the authorities upon the proposition, the opinion continues: "The reason upon which the doctrine rests is that public interest shall not be prejudiced by the neglect or caprice of a single member of a public body in failing or refusing to attend upon sufficient notice of its meetings; but where the law expressly requires the concurrent action of all the members of a board or body, all must participate therein, although that rule has no application to the act under consideration, which does not expressly, or by implication, require the action of all the members of the appointing board."

The learned attorney general, on behalf of Meserve, the respondent, insists that the opinion from which the foregoing excerpts were taken is not in point on the question now before us, since the statute construed in that case distinctly provided that three certain state officers should constitute a board for the appointment of fire and police commissioners, while section 3 of the depository law does not constitute the governor, secretary of state, and attorney general a board for the approval of bonds of state depository banks. It is obvious that the difference between

the two acts exists as suggested. While there is no provision in the depository law, nor in any language used therein, from which an inference may be properly drawn that a board is created out of the three executive state officers therein mentioned, or that said officers shall act as a body when considering depository bonds submitted for approval, it does not necessarily follow that the case is not controlled by the principle underlying the decision in *State v. Bemis, supra,* or that the legislature intended to require that a bond given by a bank seeking to become a depository of state funds should be approved by each of the three state officers as a condition precedent to the validity of such bond. On the contrary, our investigation of the subject satisfies us that it was not necessary that all three of the state officers should have concurred in the act of approving said bonds, but that the act of the majority was sufficient, all of them having met and conferred together. The rule is well settled that where authority is committed to three or more persons to perform a public duty or trust, if they all meet for the purpose of executing it, a majority may decide. The authorities all so hold, and the attorney general has cited no case, nor after diligent search have we been able to find a single one, which conflicts therewith. In support of the proposition that the act of a majority is sufficient, see Mechem, Public Officers, sec. 572, and cases cited. (*Crocker v. Crane,* 21 Wend. [N. Y.], 211; *Woolsey v. Tompkins,* 23 Wend. [N. Y.], 324; *Darge v. Horicon Iron Mfg. Co.,* 22 Wis., 691; *Jewett v. Alton,* 7 N. H., 253; *Patterson v. Leavitt,* 4 Conn., 50.)

An early case is *The King v. Beeston,* 3 Term Rep. [Eng.], 592, in which the church wardens and overseers, with the consent of a majority of the parishioners, were by statute authorized to contract for the support of the poor. The overseers and all but one of the church wardens joined in making a contract, and he declined to do so. The contract was upheld. Lord Kenyon, C. J., said: "A contract has been entered into in which the parish at large is concerned, and which the act of parliament has enabled the

parish officers with the concurrence of the parish to enter into, and the question is whether one obstinate man, in opposition to all the rest of the parish, in an act in which they are more interested than he is, shall be able to defeat their purpose.   *   *   *   In common understanding what is required to be done by the church wardens and overseers is satisfied by being done by a majority."

A case similar to the last one is *Withnell v. Gartham*, 6 Term Rep. [Eng.], 388, where a power was conferred upon the vicar and church wardens to appoint a school master, and it was held that the vicar and a majority of the church wardens might lawfully act.   Lawrence, J., in his opinion, says: "In general it would be the understanding of a plain man that, where a body of persons is to do an act, a majority of that body would bind the rest."

*Williams v. School District*, 21 Pick. [Mass.], 75, was an action to recover back the sum of $21.91 paid by plaintiff for a school district tax, claimed to have been illegally levied, because the assessment was made by only two of the three assessors; the other, although duly notified, refused to attend and act in assessing the tax.   Shaw, C. J., in passing upon the objection observed: "It appears by the case that the other assessor received notice and was requested to act with them, but refused to do so.   Where a body or board of officers is constituted by law to perform a trust for the public, or to execute a power or perform a duty prescribed by law, it is not necessary that all should concur in the act done.   The act of the majority is the act of the body.   And where all have due notice of the time and place of meeting, in the manner prescribed by law, if so prescribed, or by the rules and regulations of the body itself, if there be any, otherwise if reasonable notice is given, and no practice or unfair means are used to prevent all from attending and participating in the proceeding, it is no objection that all the members do not attend, if there be a quorum.   In the present case all three having had notice and an opportunity to act, the act of two is sufficient."

In *Horton v. Garrison*, 23 Barb. [N. Y.], 176, the last paragraph of the syllabus reads thus: "The rule that when an authority is to be exercised by several officers, they must all concur in its exercise, or all meet and consult and a majority agree to the act, is subject to the qualification that if one is notified to attend, and refuses, it is the same as if he had attended and dissented to the act of the majority."

There was involved in *Louk v. Woods*, 15 Ill., 256, the existence of a public highway. In pursuance of the provisions of the road law of Illinois, three persons were appointed to view the ground, locate the road, and report their action to the county court. The report upon the location of the highway in question was signed by two of the three viewers alone, and for this reason the trial court rejected as evidence said report. The ruling was reversed on a review of the case. Scates, J., in delivering the opinion of the court, says: "The general rule laid down on this subject is that where a number of persons are intrusted with powers in matters of public concern, and not of mere private confidence, and all of them are regularly assembled and consulting, the majority may act and determine, if their authority is not otherwise limited and restricted." The same doctrine in a case similar in its facts was stated in *Babcock v. Lamb*, 1 Cow. [N. Y.], 238.

By an act of the congress of the United States, the governor and judges of the supreme court of the territory of Michigan were empowered to lay out the town of Detroit, adjust claims to lots therein, and give deeds for the same. Under and in pursuance of such act, the three judges of the supreme court alone executed a deed conveying a lot in Detroit to the Detroit Young Men's Society. Subsequently, in *Scott v. Detroit Young Men's Society's Lessee*, 1 Doug. [Mich.], 119, the validity of said conveyance was assailed on the ground, among others, that the governor did not join with the judges in executing the deed. The court upheld the validity of the conveyance, and in passing upon the question used this language: "As a general

proposition, it is undoubtedly true, that where several persons are appointed to execute a power or trust, and no authority is given to a less number than the whole to act, all must join in its execution. A distinction is drawn, however, between a mere private trust or power and a power of a public nature, conferred by law, in the execution of which, it is contended, that a majority have a right to act. If all are present to deliberate, although a majority only assent to the act, it is unquestionably sufficient. * * * And, in this case, in the absence of proof to the contrary, it will be presumed that the governor was present and consulted with the judges touching the grant and conveyance to the Detroit Young Men's Society of the lot in question."

By section 5 of article 4 of the constitution of the state of Ohio it is provided: "District courts shall be * * * held in each county therein at least once in each year, * * * provided that the general assembly may, by law, authorize the judges of such district to fix the times of holding the courts therein." The legislature of that state, by section 7 of the act of March 29, 1856, in relation to the time of holding courts, authorized the judges of the district court to appoint special terms for good cause at such times as they shall determine, on giving thirty days' previous notice thereof. Three of the five judges of the district court of the fourth judicial district signed an order calling a term of court in and for Cuyahoga county, one of the counties comprising said judicial district, and due notice of said order was given, and the term of court was held at the time appointed. In *Merchants v. North*, 10 O. St., 251, it was urged that the term of court so held was illegal, because a mere majority of the judges of the district court joined in the order calling the same. This contention was overruled, the court holding, in accordance with well established principles of law recognized in analogous cases, that where all of the judges were notified of the time and place of the meeting at which the appointment of the special term was deter-

mined upon, the concurrent action of the majority of the judges was legal and binding.

A case in point upon the question under consideration is *People v. Nichols*, 52 N. Y., 478. That was an application for a peremptory *mandamus* against the respondent as comptroller of the state of New York, to compel him to draw a warrant upon the state treasurer in favor of relator for the sum of $20,000, in payment of certain relics of George Washington. The legislature appropriated that sum for the purchase of the relics, the act providing that the money was to be paid to Mrs. Washington upon the certificate of three persons named in the act, Martin Grover, the chancellor of the university, and J. Carson Brevort, that the relics were genuine, and that in their opinion it was desirable that they should be placed in the museum of the state library. The three persons designated met, one of them refused to certify, and the other two signed the required certificate, which was presented to the comptroller and a warrant for the money demanded. The warrant was refused, upon the sole ground that all did not join in the certificate. The court held that the procuring of the certificate required by the act was a condition precedent to any right to the money, and that the certificate signed by two of the three persons designated was sufficient.

Section 113, chapter 11, General Statutes, p. 195, authorized any railroad company to cross the line of any other railroad and provided, in case of a disagreement between the corporations as to the amount of compensation to be made therefor, or the place and manner of such crossing, that the same should be determined by commissioners to be chosen in the mode prescribed by law. Section 97 of the same chapter empowered the county judge to select six disinterested freeholders of the county, whose duty it was made to determine the matters aforesaid, and make report in writing to him, but it contained no provision that a less number than all the commissioners could act. Under said sections, six commissioners

were duly appointed for the purpose of assessing the damages accruing to the Union Pacific Railway Company by reason of the crossing of its tracks by two other railroad companies, as well as designating the place and manner of crossing. The commissioners proceeded in the discharge of their duties, and made report in writing to the county judge, which was signed by four of them alone. The validity of their report was assailed in the case of *Union P. R. Co. v. Burlington & M. R. R. Co. in Neb.*, 1 McCrary [U. S. C. C.], 452, upon the ground, among others, that all the commissioners did not sign. Judge McCrary, in the course of his opinion, said: "The law upon this subject is that where authority is vested in three or more persons to determine a public question or matter of public concern, a majority have power to decide, provided all act on the matter. If the matter be one of private concern all must concur, unless provision is made for a decision by a less number. * * * That the condemnation of a right of way in the exercise of the power of eminent domain is a public matter within the rule is not only clear, under the authorities, but also upon principle, since the proceedings can be justified only upon the ground that the land should be taken for public use for the public interest."

The principle deducible from the numerous authorities on the subject is that where three or more persons are entrusted by law with powers of a public character or nature, and in the execution thereof all of them are assembled, or have been duly notified of the time and place of meeting, the decision of the majority is binding, whether the statute authorizes a majority to act or is silent. Applying this rule to the facts before us, it is very evident that the approval of the governor was not essential to the validity of the bonds of the depository banks, since he was present with the other two state officers when the bonds were approved.

Is the bond of a state depository invalidated by the depositing of a sum of money therein by the state treas-

urer in excess of fifty per cent of the amount of the penalty of the bond given by the bank? Neither in the briefs nor upon oral arguments at the bar was this question discussed by counsel, and, therefore, according to precedents, the court might ignore it, notwithstanding it is raised by the record; but we shall not do so. The principle which should control our decision upon this feature of the case has already been recognized and applied by the court in *McAuley v. Cooley*, 45 Neb., 582, 47 Neb., 165. It is disclosed by that case that J. H. Cooley and George A. Bently formed a trading copartnership. By the terms of the articles, the total amount of capital was limited to $3,000, and said Bently was to have charge of and manage the business. W. S. McAuley and Charles S. Furer executed a bond with Bently conditioned for the due and faithful performance by the latter in and concerning the business in which the firm was engaged. After the giving of the bond, the capital was increased to $5,000. In an action on the bond, it was held that the sureties thereon were not released from their obligation by such increase in the amount of capital invested. It requires no argument to show the application of that decision to the facts under consideration. The depository law has fixed the maximum sum which the treasurer shall have on deposit in any bank at the same time at one-half of the amount of the bond executed by the bank. This is a limitation not only upon the power of the treasurer to deposit, but restricts the bank from demanding a larger sum than one-half of the penal sum named in the bond. Were it not for this limitation, unquestionably a depository bank and the sureties upon its bond would be liable, in case of a breach of its conditions, to the extent of the full penalty written in the bond. If the treasurer exceeds his duty by depositing a larger sum in a depository bank than he is authorized by law to do, it does not affect the liability of such bank and the sureties on its bond to repay to the state the sum deposited therein in strict conformity to the requirements of the depository law and the accretions

thereof.   (See *Taylor v. Standard Life & Accident Ins. Co.*, 47 Neb., 673.)

We now pass to a consideration of the remaining question, whether it was the duty of Bartley to have drawn from the state depositories, and paid over to his successor, all moneys therein belonging to the state at the close of his term.   By the eighth subdivision of section 2, article 4, chapter 83, Compiled Statutes, relating to the duties of the state treasurer, it is provided: "He shall account for and pay over all moneys received by him as such treasurer to his successor in office, and deliver all books, vouchers, and effects of office to him, and such successor shall receipt therefor." If this section stood alone upon the statute relating to the duties of that officer, and there was no other legislation on the subject, there would be more force to the argument advanced by the attorney general, that it was the intention of the legislature to require a retiring state treasurer to turn over, to hand over, to deliver the physical possession of, the moneys belonging to the state to his successor.   It has been for many years a matter of public notoriety that in the settlements between the different state treasurers payments have been seldom, if ever, made in specie or lawful money, but have been almost invariably effected through the agency of certificates of deposit, checks, and bank drafts.   We know, too, in the same way, that for many years it has been the custom of state treasurers to deposit state funds in banks for the private gain of the officer depositing the same.   It was these matters, doubtless, which prompted the legislature to pass the law entitled "An act to provide for the depositing of state and county funds in banks," generally known as the depository law, and under which the funds in dispute were placed in banks.   It is therefore to that piece of legislation, when construed with reference to its general scope and object, that we must look to ascertain the duties of the state treasurer in the premises.   By section 1 of said law (Compiled Statutes, 1895, ch. 83, art. 13,

sec. 3a) it is made the duty of the state treasurer to deposit, and at all times to keep on deposit in state or national banks, or some of them transacting business within the state, and of approved standing and responsibility, the moneys in his hands belonging to the several current funds in the state treasury, subject to payment on his check, and the bank is required to pay for the use of such funds not less than three per cent per annum upon the amounts so deposited. The next section fixes the basis for computing such interest, when the same shall be paid and credited to the state, and for the keeping by every such depository separate accounts of the several funds of the state as may be deposited. The third section of the law has been sufficiently set forth in the first part of this opinion. Section 4 provides: "The making of profit, directly or indirectly, by the state treasurer out of any money in the state treasury belonging to the state, the custody of which the state treasurer is charged with, by loaning, depositing, or otherwise using it, or deposing [?] the same in any manner, or the removal by the state treasurer, or by his consent, of such moneys, or a part thereof, out of the vault of the treasurer's department, or any legal depository of the same, except for the payment of warrants legally drawn, or for the purpose of depositing the same in the banks selected as depositories under the provisions of this act, shall be deemed guilty of felony, and on conviction thereof shall be subject to punishment in the state penitentiary for the term of not more than two years, or a fine not exceeding five thousand ($5,000) dollars, and shall also be liable under and upon his official bonds for all profits realized from such unlawful using of such funds. And it is hereby made the duty of the state treasurer to use all reasonable and proper means to secure to the state the best terms for the depositing of the money belonging to the state consistent with the safe keeping and prompt payment of the funds of the state when demanded." (Session Laws, 1891, p. 350, ch. 50, sec. 4.) The provisions of said sections were be-

fore this court for consideration in *State v. Bartley*, 39 Neb., 353, where it was held that the depositing of public funds in bank under the depository law is, in substance and legal effect, a loan and investment of the moneys so deposited. We quote what we then said in the opinion on this subject: "Does the statute attempt to authorize the loaning or investing of these trust funds? Counsel for relator contends that it does not; that it merely requires their deposit temporarily for safe keeping, pending need for use or opportunity for permanent investment. This construction would be a reasonable and proper one if the deposit contemplated by the statute was a special one merely for safe keeping, and that the same identical money should be returned. But this is not the kind of deposit the legislature meant. If it was, the purpose is not indicated in the title of the act, since it makes no reference to the safe keeping of the funds deposited in banks. It is manifest, from an examination of the entire act, that a general deposit of the funds was what the framers intended. True, the first section declares that 'the state treasurer shall deposit, and all times keep in deposit for safe keeping,' in the banks that shall be designated as depositories, the moneys in his hands belonging to the several current funds, subject to payment on the treasurer's check; but further along, in the same section, the bank receiving and keeping such deposit is required to pay the state not less than three per cent per annum upon the amounts so deposited; and the next section provides, among other things, in substance, that the interest shall be computed on the average daily balances of the public moneys kept on deposit. While the statute mentions 'safe keeping,' when the several provisions are construed together it is quite clear that the transaction contemplated does not amount to a special deposit. Whoever heard of that kind of a deposit of money being paid out on checks, or of a banking institution paying for the privilege of holding a special deposit of funds? The identical moneys deposited are not re-

quired to be returned. Obviously, the bank receiving them had the right to use and control the money as its own. It could loan the funds for the purpose of earning the money with which to pay the stipulated interest due the state. A deposit of state funds, under the provisions of the law, amounts to a loan or investment of the funds so deposited." After citing, commenting upon, and quoting from numerous authorities from this and other courts, the opinion continues as follows: "The conclusion is irresistible that the framers of the law under review contemplated that the moneys deposited in pursuance of the provisions thereof should be retained by the bank receiving the same for an indefinite period of time and be used and loaned by it as its own, the bank being under obligation to repay the amount so deposited on the presentation of the check of the state treasurer. There is no room for doubt that where money is deposited under this act, the bank receiving the same is not a bailee, which would be the case if the title to the money remained in the state after the same was received by the bank."

Under the depository law, public funds are required to be deposited by the treasurer on open account, subject to payment on the presentation of the check of the treasurer. The depositing of the moneys of the state in a depository bank by the treasurer in pursuance of law is, in legal effect, a loan of such moneys to the bank, and the relation of debtor and creditor is thereby created, not between the bank and the treasurer, but between the former and the state, since the money thus deposited belonged to the state, and not to the treasurer, its agent and representative. A depository bank being the state's debtor for all funds deposited therein in compliance with law, all sums so remaining on deposit at the close of Mr. Bartley's term were not moneys in his hands in such a sense as he was bound at his peril to produce them in making settlement with his successor. He was under no more obligation to do that than he was required to pay over to his successor the amounts represented by any unpaid past due county

bonds or other securities belonging to the permanent
school fund. No one will contend that in the case of the
bonds the outgoing officer is compelled to turn over the
money to his successor, where none has been paid or col-
lected. The law, his bond, and official oath, everyone will
agree, would be satisfied by the delivery of the bonds.
The county is the debtor of the state to the extent of the
amount due on such bonds, and the depository bank is in-
debted to the state for the amount of its public funds re-
maining on deposit, and the production and delivery of
proper evidences of the true condition or state of the ac-
count ought to answer the requirements of the statute.
This view is strengthened by section 11 of the depository
law (Session Laws, 1891, ch. 50, sec. 11), which provides:
"That no treasurer shall be liable on his bond for money
on deposit in bank, under and by direction of the proper
legal authority, if said bank has given bond," as well as by
section 4 already quoted. By the provisions of which sec-
tion it is made a penitentiary offense for a state treasurer
to withdraw moneys deposited in a legal state depository
"except for the payment of warrants legally drawn, or for
the purpose of depositing the same in the banks selected
as depositories under the provisions of this act." Con-
struing said section literally, the treasurer has no right
to demand the return of moneys in a depository bank, ex-
cept for two objects, neither of which is to make settle-
ment with his successor. We do not wish to be under-
stood as intimating that he might not lawfully draw the
funds for the purpose last stated prior to the expiration
of his term, but what we do decide is that he is not liable
for a failure so to do. Certainly Mr. Bartley, after he had
retired from office, had no right to check out the funds,
since they did not belong to him, and he is no longer the
representative of the state. If it is the duty of an out-
going state treasurer to produce the cash for the amount
of funds deposited in bank according to law, it likewise
follows he must make good to the state the moneys lost,
without his fault, in a depository bank. Such a holding

would be in the teeth of the statute. Whether a treasurer is liable for the loss of funds deposited by him in an insolvent depository, where he at the time had knowledge, or by the exercise of reasonable care could have ascertained, that such bank would not promptly pay the money on demand, it is unnecessary to decide, as no such question is presented by the stipulation of facts. It will not be amiss to here call attention to the fact that in two cases we have, in effect, held that the proper officers approve not only the bonds, but the depositories as well. (See *State v. Bartley*, 39 Neb., 353; *State v. Owen*, 41 Neb., 651.)

It is contended that in case the depositories, upon the surrender by Mr. Bartley of his office, were unable to pay the funds belonging to the state, and Mr. Meserve should accept the accounts in settlement instead of the cash, any loss of those funds would fall upon the latter, and *Bush v. Johnson County*, 48 Neb., 1, is cited to sustain the proposition advanced by the attorney general. No such question is presented by this record, nor was it passed upon in the case just mentioned. There an incoming county treasurer accepted from his predecessor in office a certificate of deposit issued by a bank for the amount thereof, instead of coin or currency, and it was held that the former and his sureties were chargeable therewith. The facts in that case arose before the depository law, and hence the decision has no bearing upon the point under consideration. In *City Savings Bank of Detroit v. Huebner*, 84 Mich., 391, it was held that the designation of a county depository for the public funds is valid until the expiration of the term of office of the county treasurer, and until a new designation is made by his successor and the board of auditors, which they should make as soon as convenient after the new officer enters upon the discharge of his official duties, and that until such new designation is made it is obligatory upon the treasurer to deposit the public funds in the existing depository or depositories. The opinion in that case neither contains the law therein con-

strued, nor is the substance of any of its provisions given. Assuming that the depository law of Michigan, like our own, contains no provision as to the length of time a bank which has been designated a depository of public funds remains such depository, and that court has given it the proper interpretation, yet the decision mentioned is not a precedent for holding that this outgoing treasurer is required to withdraw the funds from the depositories and deliver the physical possession of the same to his successor, since in that event it would be the duty of the latter, under that decision, to redeposit the moneys in the same depositories until such time as new ones were designated and their bonds were approved by the proper officers.    The effect of the Michigan case is, not that all dealings with state depositories are to be wound up at the end of the treasurer's terms, but when new depositories have been properly designated after the new treasurer has qualified and entered upon the discharge of the duties of his office.

It is finally contended that if the construction we have placed upon the statute should obtain, then the depository law is inimical to section 11, article 3, of the constitution, in that it is amendatory of subdivision 8, section 2, article 4, chapter 83, Compiled Statutes, relating to the duties of the state treasurer, and does not contain the section so amended, nor repeal the same.    This objection is not well taken.  To give the subdivision mentioned a literal rendition would make it the duty of a state treasurer to pay over "all moneys received by him as such treasurer to his successor in office," though he may have paid the same out on warrants properly drawn upon the treasury, which would be absurd.   He is, of course, only required to pay over the moneys unaccounted for "and effects of office to him." If the word "effects" is not broad enough to require the delivery of bonds and other securities belonging to the state permanent school fund, there is no statute making it the duty of a treasurer to deliver them to his successor.   But they are embraced within the term

"effects," and so are moneys loaned to state depositories. It follows that the depository law is not repugnant to the constitution as being amendatory of the eighth subdivision of said section 2 of the statute. Judgment will be entered in accordance with this opinion.

JUDGMENT ACCORDINGLY.