WILLARD BEHRENS v. STATE OF NEBRASKA.

1 N. W. (2d) 289

FILED DECEMBER 12, 1941. No. 31172.

*Frank J. Reed,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Rush C. Clarke, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, MESSMORE and YEAGER, JJ., and CHAPPELL and ELLIS, District Judges.

EBERLY, J.

In this case the defendant, Willard Behrens, prosecutes error from the judgment and sentence of the district court for Scotts Bluff county determining him guilty of a violation of section 39-1159, Comp. St. Supp. 1939, and ordering

that he be confined in the Nebraska reformatory for men for a term of from three (3) to four (4) years. The information on which he was tried, in substance, charged that the "defendant on the 28th day of July, 1940, in the county of Scotts Bluff, * * * then and there being did then and there, drive and operate a certain motor vehicle when and while the said motor vehicle was involved in an accident resulting in the death of Irene Margheim, and did then and there wilfully, feloniously and unlawfully fail to stop said motor vehicle at the scene of said accident," etc. Three sections of our statutes are of importance in this proceeding:

Section 39-1159, Comp. St. Supp. 1939, which reads as follows: "(a) The driver of any vehicle involved in an accident resulting in injury or death to any person shall immediately stop such vehicle at the scene of such accident and any person violating this provision shall upon conviction be punished as provided in section 56 (Comp. St. Supp. 1939, sec. 39-1187) of this act. (b) The driver of any vehicle involved in an accident resulting in damage to property shall immediately stop such vehicle at the scene of such accident and any person violating this provision shall upon conviction be punished as provided in section 54 (Comp. St. Supp. 1939, sec. 39-1185) of this act. (c) The driver of any vehicle involved in an accident resulting in injury or death to any person or damage to property shall also give his name, address and the registration number of his vehicle and exhibit his operator's or chauffeur's license to the person struck or the driver or occupants of any vehicle collided with and shall render to any person injured in such accident reasonable assistance, including the carrying of such person to a physician or surgeon for medical or surgical treatment if it is apparent that such treatment is necessary or is requested by the injured person."

Section 39-1187, Comp. St. Supp. 1939, which provides penalties for an infraction of the previous provisions, and section 39-1190, Comp. St. Supp. 1939, relating to the in-

terpretation of the statutory provisions here under consideration are involved.

These provisions were originally enacted as a part of chapter 110, Laws 1931, an act entitled "An act relating to motor vehicles and regulating the operation of vehicles on the highways," etc. In *Bainter v. Appel*, 124 Neb. 40, 245 N. W. 16, it is stated: "This legislation evidences the substantial adoption by Nebraska of the provisions of the 'Uniform act regulating the operation of vehicles on highways' as recommended and approved by the commissioners on uniform state laws in 1926, and which since that time has been, in effect, adopted by the legislatures of seventeen of the states of the Federal Union, in addition to our own. Section 59 of this chapter 110 provides: 'This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact similar legislation.' In the construction of similar enactments adopted for the purpose of securing uniformity and certainty in certain laws throughout this nation, this jurisdiction is committed to the view that each of such statutes should be so construed, in the light of the cardinal principles of the act itself, as to give effect to this design. *Peter v. Finzer*, 116 Neb. 380; *International Milling Co. v. North Platte Flour Mills*, 119 Neb. 325. See, also, *Commercial Nat. Bank v. Canal-Louisiana Bank & Trust Co.*, 239 U. S. 520."

The incident forming the basis of this prosecution occurred on Sunday, July 28, 1940. On that afternoon and evening, a party of four young people, composed of the defendant, Willard Behrens, aged 19 years, who lived near Gering, his friend, Reuben Herdt, whose home was east of Scottsbluff, out over the Overland Drive, Elizabeth Giesel, aged 17 years, who lived in Gering, and Irene Margheim, whose home was in southeast Scottsbluff. The party indulged in an automobile ride. They then spent some two and a half hours at a skating rink, following which lunch was had. Then the Giesel girl was taken to her home in Gering. The remainder of the party, with Behrens at the

wheel and Irene Margheim with him in the front seat, and Reuben Herdt in the back seat of the automobile, started for Scottsbluff to return the two latter to their respective homes. Arriving at Scottsbluff they were proceeding eastward on the Overland Drive. The defendant testifies that, just as they had passed the intersecting street leading to the home of Irene Margheim, "we started down east Overland, and I don't remember just what street it was, but she said, 'Here is where you turn to take me home.' And I said, 'Well, let's take Reuben home, he just lives a little ways out here—we will be back in fifteen minutes.' * * * Then she said, 'Take me home first or I will jump out.' And she opened the door and jumped out." This testimony is substantially corroborated by the evidence of Reuben Herdt, the only other eyewitness of the transaction. Herdt also testifies that the speed of the automobile did not exceed 20 miles an hour, and Behrens' evidence is that the speed of the automobile was from 15 to 20 miles an hour. Behrens also testifies: "After she jumped out, why, I said to Reuben, 'See if she is up.' And he looked around and he said, 'It looks like she is walking.' " Behrens then continued on his way. His further testimony is: "Q. Did you know when Lizzy jumped out—when Irene jumped out that she was injured? A. No; not from the speed we were driving. I could have jumped out myself and stayed on my feet. Q. Did you believe after talking to Reuben that she was on her feet and was uninjured? A. Yes; I did." This occurred almost in front of the Wardman Hotel in the city of Scottsbluff. The record is silent as to the state of illumination of the street at this place beyond Herdt's testimony that it was dark. About the time of the accident a highway patrolman was on this Overland Drive about three blocks east from where the dead body of Miss Margheim was discovered lying on the south side of this drive approximately four feet from the edge of the pavement. During this time he was in this position he had observed "a car going east," which he does not identify, and which he says, "was not going rapidly." Behrens' testimony, as

follows, is undisputed: "Q. Did your car in any way swerve from the road or leave the usual traveled part of the road at the point she left the car? * * * A. No; it did not. Q. Did your car strike anything at that time? A. No. Q. Or did anything strike your car? A. No; it did not. * * * Q. Did your car sustain any injury or damage in any way to your knowledge that night? A. No."

A serious question presented is, does the record before us sustain the conviction of the defendant?

"In this state (Nebraska) all public offenses are statutory; no act is criminal unless the legislature has in express terms declared it to be so; and no person can be punished for any act or omission which is not made penal by the plain import of the written law." *Lane v. State,* 120 Neb. 302, 232 N. W. 96. See, also, *State v. De Wolfe,* 67 Neb. 321, 93 N. W. 746; *State v. Pielsticker,* 118 Neb. 419, 225 N. W. 51.

So too, the defendant pleading not guilty is clothed with the presumption of innocence which stands as evidence in his favor, until the state by its proof shows him to be guilty beyond a reasonable doubt, and all doubts must be resolved in favor of the accused. *Bourne v. State,* 116 Neb. 141, 216 N. W. 173; *Flege v. State,* 90 Neb. 390, 133 N. W. 431.

Section 39-1159, Comp. St. Supp. 1939, is a penal statute and is interpreted in accordance with the rule above set forth, and proof of offenses charged thereunder must conform in degree to that prescribed for the establishment of commission of crimes. "Criminal liability does not attach in all cases where a literal application of the language of the statute might be made." 9-10 Huddy, Cyclopedia of Automobile Law (9th ed.) 179, sec. 103. Such section 39-1159 should be so construed as to render it a consistent, harmonious whole. In other words, a statute should be so construed as to make all its parts harmonize with each other and to render them consistent with its general scope and object. *Jones v. York County,* 47 Fed. (2d) 837; *State v. Bartley,* 39 Neb. 353, 58 N. W. 172.

It is also true that the proper rule of construction appears

to be: "In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject-matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately." 59 C. J. 993. See, also, *United States v. Baltimore & O. S. W. R. Co.*, 159 Fed. 33; *Gibson v. Gibson*, 43 Wis. 23.

"It is to be presumed that all the subsidiary provisions of an act harmonize with each other, and with the purpose of the law; if the act is intended to embrace several objects, that they do not conflict. Therefore it is an elementary rule of construction that all the parts of an act relating to the same subject should be considered together, and not each by itself." 2 Lewis' Sutherland, Statutory Construction (2d ed.) 659, sec. 344.

"A word or phrase repeated in a statute will bear the same meaning throughout the statute, unless a different intention appears." 2 Lewis' Sutherland, Statutory Construction (2d ed.) 758, sec. 399.

The foregoing are but instances of the application of the well-established canons of construction: *"Noscitur a sociis"* (the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it). 2 Lewis' Sutherland, Statutory Construction (2d ed.) 803, sec. 414; and *"Ex antecedentibus et consequentibus fit optima interpretatio".* (a passage is best interpreted by reference to what precedes and what follows it). Broom's Legal Maxims (10th ed.) 389. See, also, *Hamilton v. Thrall*, 7 Neb. 210.

The subject of this legislation quoted, and of each of the three sentences which together comprise it, is "any vehicle involved in an accident." These words we find employed in the three sentences which together contain the full expression of the legislative intent with reference thereto. Such expressed intent as a consistent and harmonious whole is necessarily controlling. This controlling intent as deduced from the whole will prevail over that of a

particular part considered separately. Also, the words or phrase "any vehicle involved in an accident" repeated in this statute must bear the same meaning in all sentences, unless a different intention appears. In the third sentence the nature and character of the involvement expressed by the words, "any vehicle involved in an accident resulting in injury or death to any person," is clearly made to appear by the legislative use of the words "to the person struck" and "any vehicle collided with." There must be a striking of the person or an actual collision with a vehicle with ensuing results to accomplish the involvement in the accident which this law penalizes as set forth in the first sentence. Only by the application of this definition to the terms of the statute will it be and constitute a harmonious whole, and thus only will the act punishable by it be made penal by the plain import of the written law.

Under the undisputed evidence in this case, it is not established that the deceased was struck or injured by the automobile, but rather that she voluntarily jumped from the moving vehicle and was injured in alighting, without in any manner coming in contact with defendant's automobile. This accident resulting in her death was not therefore one in which the automobile of which the defendant was then the driver was "involved" as that term is employed in section 39-1159, Comp. St. Supp. 1939.

The question of lack of knowledge on part of the accused as affecting his criminality is also presented by this record. As to this it may be said that under this statute an automobile driver is not criminally liable for failure to stop and failure to render aid to an injured person when he does not know that an accident has happened, an injury has been inflicted, or a death has occurred. *People v. Rallo,* 119 Cal. App. 393, 6 Pac. (2d) 516; *People v. Ely,* 203 Cal. 628, 265 Pac. 818; *Scott v. State,* 90 Tex. Cr. 100, 233 S. W. 1097.

Further, lack of such knowledge constitutes a proper defense. *Olson v. State,* 36 Ariz. 294, 285 Pac. 282. It is a question of fact and not of law. Although we have

this question of knowledge on part of the accused in this case as a matter of conflicting evidence, he was entitled to have his theory of this transaction submitted to the jury by a proper instruction, and a refusal by the district court so to do constituted error.

The judgment and sentence of the trial court being erroneous, the same are reversed and the cause remanded.

REVERSED.

CHAPPELL, District Judge, dissenting.

I cannot concur with my colleagues in the able majority opinion. A belief that defendant is guilty, out of his own mouth and under his own law, impels an effort to give reason to it. I agree generally with the statement of facts appearing in the majority opinion except that there are some facts not recited which, to me, are important in this factual determining case.

Defendant Willard Behrens, 19 years old, driving his father's car, met another youth, Reuben Herdt, in the afternoon of Sunday, July 28, 1940, the day of the alleged offense. Later in the evening they picked up two young girls, Irene Margheim, the deceased, being one of them, and took the girls with them in the car. Irene Margheim was the partner of defendant, and at the time of the tragedy was riding in the front seat with him. They drove around for a while, roller-skated, and lunched in taverns and cafes. The evening before, on Saturday, these boys and others had purchased a case of beer. They had been drinking beer during the afternoon of Sunday. In the evening, before the tragedy, the boys drank the last of the beer which they had purchased on Saturday night, two bottles each, before they got to Gering, where they drank some more beer at a tavern. There is no evidence that the girls drank any. Late at night the boys took the other girl home first, after which they started home with Irene Margheim. Defendant was not bothering her in any way, or putting his arms around her at the time, but, when they had stopped the car before, he had done so. Defendant drove past the corner to turn towards her home,

and she said to him, "You should have turned there," and defendant replied: "I can't. I am past. We will take Reuben home first." Defendant testified that she then said, "Why don't you take me home first?" "Take me home first or I will jump out." Reuben Herdt testified that she said to defendant, "If you don't stop and let her out, she would jump," or "If you don't take me home first, I will jump out," or "Willard, if you don't take me home, I will jump out." She said that a couple of times, but defendant drove on, and immediately thereafter she jumped out of the car while it was going about 20 miles an hour. She left the car, however, from two to four blocks after they had passed the corner to turn to her home. Defendant himself testified that he did not know how she got out of the car. He did not know whether she jumped, or fell out, but he knew that she got out of there some way. The two boys heard the click of the door, felt the breeze when the door was opened, and she was out of the car, it being uncertain whether she stood on the running-board and tried to face the way the car was going or whether she went straight out. The defendant slowed up and closed the door, then resumed his previous speed, but he did not stop.

Defendant testified that he asked Reuben Herdt, "Did she get up?" or "See if she is up. If she ain't, we better stop." And that Reuben Herdt replied, "It looks like she did," or "It looks like she is walking." Reuben Herdt denies that he said this to defendant, and testified that he said to defendant, "Maybe we ought to stop," but that defendant did not stop. In a statement made by defendant immediately after his arrest, he said, "We should have stopped, I know that." Defendant drove on a mile or more, where Reuben Herdt, admittedly at defendant's direction, threw the empty beer bottles out of the car, and defendant turned around and drove back to the place of the accident. They saw her lying in the road. He told his brother a short time after the accident that they went past the body. Defendant testified, "We saw something laying there and we didn't stop." In his statement, made immediately after

his arrest, he said, "She was laying there. * * * Right east, right west of them gas pumps. * * * On the south. * * * Kinda northeast and southwest. * * * Crumpled up. * * * Sideways," but defendant did not stop the second time. He drove on to Gering by a devious route, on side streets, got his brother and another, then drove back to the place of the accident; saw the girl lying in the road, a crowd and the police, but he did not even stop the third time, for the reason, in his own words, "Because we knew it was against the law to monkey with a dead person or injured person." He drove on home, where he was arrested a few hours later. The girl was dead from a basal skull fracture caused by impact with the road. Defendant was tried by a jury of his peers, his own neighbors, and after a fair and impartial trial they found him guilty as charged in the information.

Defendant's assignment that the trial court erred in its refusal to give his requested instruction No. 5, bearing upon the question of whether defendant had knowledge of the injuries or death, is without foundation in either law or fact.

In this kind of case, most courts hold that such knowledge, scienter, is not a necessary element for the state to prove beyond a reasonable doubt in order to convict the defendant. *State v. Masters,* 106 W. Va. 46, 144 S. E. 718. It is a matter of defense, and then only if present as an issue. It clearly appears in the state's evidence that defendant had knowledge of such injuries or death, and although defendant first denies it, says that he did not even look back to see what happened, he thereafter *admits it in his own evidence.* It is never an issue when so admitted by defendant. Nevertheless, the trial court, in instructions given the jury three times, and both in the affirmative and the negative (see instructions Nos. 4, 6 and 7), placed the burden of proving scienter beyond a reasonable doubt upon the state. The defendant had the benefit of such favorable instructions.

Defendant's chief contention, ably presented, is that the

statute does not apply to this kind of case. He admits that Irene Margheim sustained an accident, as ordinarily defined, after leaving the car, but contends that his car was not involved in it. Can this defendant thus escape all responsibility under the law?

The statute involved is section 39-1159, Comp. St. Supp. 1939, which provides: "(a) The driver of any vehicle involved in an accident resulting in injury or death to any person shall immediately stop such vehicle at the scene of such accident and any person violating this provision shall upon conviction be punished as provided in section 56 (Comp. St. Supp. 1939, sec. 39-1187) of this act." True, there are also b and c subdivisions of this statute, defining other offenses, but subdivision a, involved herein, defines a complete, separable offense, the violation of which is punishable by a complete, separable, statutory penalty. There is nothing complicated or uncertain in subdivision a. All its words are of ordinary significance. It is not ambiguous. On the contrary, it is simple as the language that ordinary men can write. It was written and passed to prevent concealment, apprehend the guilty, and promote a humanitarian doctrine. In California the language of the statute, in so far as is here applicable, is exactly the same language as that of the Nebraska statute. Speaking of it, the California court said, in *People v. Kinney*, 28 Cal. App. (2d) 232, 82 Pac. (2d) 203: "That language clearly does not limit the performance of such acts to the drivers of automobiles which strike and injure a pedestrian, or which are involved in a collision with other vehicles. It includes all machines which are involved in *accidents of any nature whatever* in which another individual is injured or killed."

To determine whether a car is involved in an accident, we must, by the evidence, determine its relationship to cause and effect. A cause is that which occasions or affects a result; a person or thing that is the occasion of an action or state; it is that without which the result would not have been; an agent that brings something about; that which produces an effect. An effect is that which is

produced by an agent or cause; the immediate result of a cause. Involved means connected with something; drawn into a complication, or implicated; included by rational or logical construction; included necessarily, or carried as a consequence, which is that which follows something on which it depends, or the relation of an effect to its cause.

Whether the parties were negligent in any manner is beside the point here. If the latch on the car door had become loosened or defective, without fault on defendant's part, so that the door had opened and deceased fell out without fault on her part, and impact with the road had killed her, it would be an accident in which his car was involved.

But here is the stronger case: Defendant's conduct and actions of the deceased threw her from the car to the road while it was in motion, and she was killed. Defendant's car was thereby involved in an accident. It was inextricably implicated to the same extent as if, when she was flying through the air, defendant's car had struck and killed her. Defendant's car was a part of the accident, and contributed to it. Without defendant's car and conduct, there would have been no accident and no death. His car was part of it, and he was a party to it. To hold otherwise will open the gates to perfect motoristic, crimeless death, without fear of criminal prosecution and conviction for failure to stop, or for manslaughter. Courts should not adopt a construction which will lead to such consequences unless the language of the statute will admit of no other as logical construction, which is not true in this case.

The record shows that defendant is a young man whose general reputation for being a law-abiding citizen in the community is good. I would not object if the court should temper justice with mercy and reduce the sentence consistent with conviction for a felony, but in all other respects the judgment should be affirmed.

PAINE, J., concurs in the dissent.