UNITED STATES, Appellee

v

OSCAR H. ROWE, JR., Gunnery Sergeant,
U. S. Marine Corps, Appellant

13 USCMA 302, 32 CMR 302

304

No. 15,730

September 14, 1962

*Fred W. Shields, Esquire,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel William H. Bennison.*

*Major Elvin R. Coon, Jr.,* argued the cause for Appellee, United States.

## Opinion of the Court

KILDAY, Judge:

A general court-martial convened at the Marine Corps Air Station, Cherry Point, North Carolina, found the accused guilty of assault and battery upon his wife and of conduct to the discredit of the armed forces, in violation of Articles 128 and 134, respectively, Uniform Code of Military Justice, 10 USC §§ 928 and 934. The conviction and

sentence, which includes a bad-conduct discharge, were affirmed on intermediate appellate review. We granted the accused's petition for further review. His principal assignment of error is the insufficiency of the evidence to support the findings of guilty of the Article 134 offense.

Specifically the accused was charged under this Article as follows:

"Charge II: Violation of the Uniform Code of Military Justice, Article 134

"Specification: In that Gunnery Sergeant (E–7) Oscar H. ROWE, Junior, U.S. Marine Corps, Headquarters and Headquarters Squadron, Marine Corps Air Station, Cherry Point, North Carolina, did, at Marine Corps Air Station, Cherry Point, North Carolina, on or about 2330 hours, 9 May 1961, violate section 20–166 of the General Statutes of the State of North Carolina, as follows: in that the said Sergeant ROWE was the driver of a vehicle involved in an accident resulting in injuries to Mrs. Merlyn B. ROWE and that he did wrongfully and unlawfully fail to render reasonable assistance to the said Mrs. Merlyn B. ROWE, in that it was apparent to the said Sergeant ROWE that medical treatment was necessary for Mrs. Merlyn B. ROWE and thereafter he wrongfully and unlawfully failed to carry her to a physician or surgeon for medical or surgical assistance; and, that such conduct was of a nature to bring discredit upon the Armed Forces."

A brief recitation of the facts of this case is necessary for a proper understanding of the matter before us.

On bingo night May 9, 1961, at the noncommissioned officers' club at about 11:00 p.m., the accused and his wife appeared to witnesses to be engaged in some sort of altercation. He struck her with such force as to cause her to fall to the ground. Nevertheless, both returned to the club bar. Mrs. Rowe conversed with some people while the accused assisted Sergeant Tucker, who had had too much to drink and had "passed out." Mrs. Rowe was next

seen about one-half hour later, walking a few feet behind the accused and Sergeant Tucker who were proceeding in the direction of the parking lot. She appeared to be in good health and her clothing was in good condition. About 8:30 a.m. the next morning, Lieutenant Johnson, a medical doctor at the station hospital, examined Mrs. Rowe at her home and determined she was dead.

According to a pretrial oral statement by the accused, he had put Sergeant Tucker on the back seat of his car to take him to his home. Mrs. Rowe accompanied him sitting on the front seat of the passenger side. Initially, the accused said that en route Mrs. Rowe fell out of the car as he went around a curve. Later, he said that he and his wife had a "heated discussion" about her objection to bringing home a "drunk." As they approached the curve in the road Mrs. Rowe said she was fed up and was leaving. She jumped from the car, which was moving about thirty miles per hour. The accused stopped the vehicle and went back to where his wife was lying in the road. The only thing "wrong" about her that he purportedly noticed was "just a bleeding from the nose." The accused said he picked up his wife, put her in the front seat of his car and drove on to the house. He then carried her from the car and placed her on the bed. At the time her nose was bleeding "minutely." He laid down beside her and either slept or rested a few minutes, then got up to take her to the hospital. He looked at her and saw the nose bleed had stopped. Although her breathing seemed to be irregular, he patted her and remarked she would "be all right in the morning," and he went to sleep. The next morning Mrs. Rowe was dead. An autopsy indicated death was due to subarachnoid hemorrhage resulting from multiple skull fractures. The pillow on which Mrs. Rowe's head rested was marked with blood. Later investigation disclosed type AB blood on the right front seat of the accused's car. The blood type matched that of the decedent.

The accused contends that the act of

a passenger in jumping or falling from a moving auto is not an accident within the meaning of the North Carolina statute defining what is loosely described as "hit-and-run." The statute reads as follows:

"§ 20–166. Duty to stop in event of accident or collision; furnishing information or assistance to injured person, etc.—(a) The driver of any vehicle involved in an accident or collision resulting in injury or death to any person shall immediately stop such vehicle at the scene of such accident or collision, and any person violating this provision shall upon conviction be punished as provided in § 20–182.

"(b) The driver of any vehicle involved in an accident or collision resulting in damage to property and in which there is not involved injury or death of any person shall immediately stop his vehicle at the scene of the accident or collision and shall give his name, address, operator's or chauffeur's license number and the registration number of his vehicle to the driver or occupants of any other vehicle involved in the accident or collision or to any person whose property is damaged in the accident or collision; provided, if the driver or other occupants of the other vehicle or vehicles involved in the accident or collision or the person or persons whose property is damaged in the accident or collision are not known, the driver shall furnish the information required by this subsection to the nearest available peace officer. Any person violating the provisions of this subsection shall be guilty of a misdemeanor and fined or imprisoned, or both, in the discretion of the court.

"(c) The driver of any vehicle involved in any accident or collision resulting in injury or death to any person shall also give his name, address, operator's or chauffeur's license number and the registration number of his vehicle to the person struck or the driver or occupants of any vehicle collided with, and shall render to any person injured in such accident or

collision reasonable assistance, including the carrying of such person to a physician or surgeon for medical or surgical treatment if it is apparent that such treatment is necessary or is requested by the injured person, and it shall be unlawful for any person to violate this provision, and such violator shall be punishable as provided in § 20–182." [1961 Cumulative Supplement, The General Statutes of North Carolina, Volume 1C, page 175.]

The North Carolina statute, originally adopted in 1937 and subsequently amended to its present language, is substantially similar to most modern state statute on this subject and is in general conformity with the suggested Uniform Vehicle Code. The humanitarian considerations present in that portion of the statute requiring reasonable assistance to persons injured have been clearly pointed out in numerous court decisions. "The purpose of this statute is to . . . . prevent the victim from being left to suffer or die without timely aid." People v Rallo, 119 Cal App 393, 6 Pac 2d 516 (1931). "It is a wholesome, humane statute." Link v State, 217 Wisc 582, 259 NW 428, 429 (1935).

The statute in parts (a) and (c) in substance compels the doing of each of the following acts: (1) The driver involved must stop after the accident, (2) he must identify himself by giving his name and address, etc., to the person struck or the driver or occupants of any vehicle collided with, and (3) he must render "reasonable" assistance to *any* person injured. Part (b) of the statute deals solely with those situations involving damage to property without accompanying physical injury. In the case at hand, it is uncontroverted that the accused did stop and did render assistance. The issues raised, however, revolve around the words "accident or collision" and "reasonable assistance." Appellate defense counsel contends that the above-detailed event is not an "accident" within the meaning of the North Carolina Statute and points out that there have been no decisions by any court in that State where the driver of a vehicle from which a person has

**307**

jumped or fallen has been held to violate this statute.

Before considering this argument, it is incumbent that we establish, at the outset, the basis on which the accused was tried; that is, whether his conviction was for a simple disorder under Article 134 or by reason of the assimilation of a specific statute of the State of North Carolina as provided for under Title 18, United States Code, Section 13, "Laws of States adopted for areas within Federal jurisdiction."

A violation of a state statute does not by itself constitute a violation of Article 134. The violation must, in fact, and in law, amount to conduct to the discredit of the armed forces. Not every violation of a state statute is discrediting conduct. United States v Grosso, 7 USCMA 566, 23 CMR 30. North Carolina law provides that violators of paragraph (a) and (c) of Section 20–166 shall be punished by imprisonment from one to five years and fined not less than $500.00, or both. Section 20–182, 1961 Cumulative Supplement, The General Statutes of North Carolina, Volume 1C, page 183. In view thereof, the court-martial could reasonably find that one convicted of a violation thereof would be guilty of conduct of a nature to bring discredit upon the armed forces of the United States. Cf. United States v Eagleson, 3 USCMA 685, 14 CMR 103.

A perusal of the record reveals that while this incident may properly have been charged merely as discrediting conduct in violation of Article 134, the trial most certainly was conducted upon the premise that the pertinent statute of North Carolina was assimilated into the laws of the United States. In fact, this matter was thoroughly discussed between the law officer and the counsel at an out-of-court hearing. After reference was made by trial counsel to Title 18, United States Code, Section 13, supra, the law officer was requested to and did take judicial notice of the General Statutes of North Carolina, Sections 20–166 and 20–182, supra. Defense counsel questioned the relevancy of those statutes contending they were superfluous on the ground that "this is a violation of Article 134, if anything, and is alleged, and alleged properly, on the sample specifications of the Code in the Manual." He cited this Court's opinion in United States v Eagleson, supra, in support of his contention.

The law officer correctly pointed out the dissimilarity of the two cases in that in *Eagleson* the charge (leaving the scene of an accident without rendering assistance) was drawn specifically as a violation of Article 134, using the sample specification in the Manual as a guide, it being only incidental that the sample specification was modeled after the District of Columbia Code; whereas, in the case at hand the specific statute of the State of North Carolina was identified in the specification as the particular law violated.

When the question of jurisdiction over the land was raised, the law officer, upon request of trial counsel, took judicial notice of Section 104–7 of The General Statutes of the State of North Carolina, Michie edition, Volume 2C, 1958, "Acquisition of lands for public buildings; cession of jurisdiction; exemption from taxation." Trial counsel then proceeded, through testimony and introduction of documents to prove that exclusive jurisdiction of the Marine Corps Air Station, Cherry Point, North Carolina, was obtained by the United States Government beginning in December 1941, and concluding in November 1944, in accordance with the above-referred to statute and Title 40, United States Code, Section 255, "Title to land to be purchased by United States; acquisition by United States of jurisdiction over lands." Additionally, trial counsel obtained testimony reflecting that the point at which the alleged offense occurred, as well as other pertinent locations, were within the area over which the United States had acquired exclusive jurisdiction.

Upon reconvening the court, the law officer explained that he had taken judicial notice of certain statutes and gave a short explanation of the Assimilative Crimes Act. At that time he also

judicially noted that the Marine Corps Air Station, Cherry Point, North Carolina, lies in and is totally situated within the boundaries of the State of North Carolina.

When the prosecution rested, trial counsel, in arguing against a defense counsel motion for a finding of not guilty as to the specification of Charge II and Charge II, affirmatively stated that the case was being tried under the Assimilative Crimes Act. The law officer, in explaining to the members of the court their authority and responsibility to consider and overrule or concur in his denial of the motion, made this fact abundantly clear when he stated, "the offense to which the motion is directed is as has been indicated by counsel, one made a federal offense by the assimilative crimes act, which I have indicated to the court earlier, makes a Federal offense out of an offense proscribed or specified in a State statute, where the situs of the offense, the place where it occurs, is in a Federal reservation, which is within that State, and to which the Federal government has exclusive or concurrent jurisdiction."

Subsequently, when giving his instructions to the court, the law officer, in answer to a request of the president for an explanation of the specific meaning of the phrase "At Marine Corps Air Station" advised that, "there is no offense if the court is not satisfied beyond a reasonable doubt that these events, if they happened, happened at the base. In other words, the whole theory of the prosecution necessarily as to Charge II must be that it happened at the Marine Corps Air Station, an area within the exclusive or concurrent legislative jurisdiction of the United States."

Having established, beyond question, the premise on which this case was prosecuted, we next proceed to a consideration of Section 13 of Title 18, United States Code, commonly referred to as the Assimilative Crimes Act, which provides as follows:

"**Laws of states adopted for areas within Federal jurisdiction.**

"Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title [special maritime and territorial jurisdiction of the United States defined], is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment." [June 25, 1948, Ch 645, 62 Stat 686.]

It should here be noted that when the Assimilative Crimes Act was originally sponsored in the House of Representatives by Daniel Webster in 1825, Congress expressly adopted the fundamental policy of conformity to those local laws in force at time of enactment. The Act made no specific reference to subsequent repeals or amendments by the State to any assimilated laws or to new offenses that might be enacted. Because of this limitation, Congress thereafter enacted comparable Acts to include laws enacted subsequent to the passage of the previous Act and remaining in force at the time of the commission of the offense. The present language, adopted in 1948, applies to validly existing state laws regardless of when they were enacted, before or after the passage of the Act, and reflects every addition, repeal or amendment of a state law.

This provision of the Code is a valid exercise of congressional authority and constitutes an adoption by Congress, for Federal enclaves, of state criminal laws in those areas where Federal criminal law has not defined a certain offense or provided for its punishment. "Rather than being a delegation by Congress of its legislative authority to the States, it is a deliberate continuing adoption by Congress for federal enclaves of such unpre-empted offenses and punishments as shall have been already put in effect by the respective States for their own government."

United States v Sharpnack, 355 US 286, 2 L ed 2d 282, 78 S Ct 291 (1958). See also, Hemans v United States, 163 F2d 228 (CA 6th Cir) (1947), cert den 332 US 801, 92 L ed 380, 68 S Ct 100, rehearing denied 332 US 821, 92 L ed 397, 68 S Ct 152 (1947); Washington, P. & C. Ry. Co. v Magruder, 198 Fed 218 (D Md) (1912); Franklin v United States, 216 US 559, 54 L ed 615, 30 S Ct 434 (1910); Hollister v United States, 145 Fed 773 (CA 8th Cir) (1906).

However, the resulting trial is not for the enforcement of the state statute but for the enforcement of █ the Federal law. In People of Puerto Rico v Shell Co., 302 US 253, 266, 82 L ed 235, 58 S Ct 167 (1937), Mr. Justice Sutherland, speaking for a unanimous court, stated:

". . . Prosecutions under that section [former Section 468, Title 18, United States Code, now Section 13], however, are not to enforce the laws of the state, territory or district, but to enforce the federal law, the details of which, instead of being recited, are adopted by reference. See United States v Press Pub. Co. . . . ." [See also United States v Warne, 190 F Supp 645 (ND Cal) (1960).]

In Williams v United States, 327 US 711, 90 L ed 962, 66 S Ct 778 (1946), Mr. Justice Burton stated, "it is natural for Congress from time to time . . . to use local statutes to fill in gaps in the Federal Criminal Code where no action of Congress has been taken to define the missing offenses."

In Johnson v Yellow Cab Transit Co., 321 US 383, 88 L ed 814, 64 S Ct 622 (1944), Mr. Justice Black stated:

". . . That broad question, though some parts of it involve a consideration of the proper scope of the state law adopted by the federal government, is in the final analysis a question of the correct interpretation of a federal criminal statute, and therefore an issue upon which federal courts are not bound by the rulings of state courts. Puerto Rico v Shell Co. (PR), 302 US 253, 266, 82 L ed 235, 245, 58 S Ct 167." [See also McCoy v Pescor, 145 F 2d 260 (CA 8th Cir) (1944); United States v Andem, 158 Fed 996 (D NJ) (1908).]

In the case at bar, there is no decision, so far as we have been able to discover, of the courts of █ North Carolina construing that portion of the statute here involved. In any event, it is the duty of this Court to construe the same in accordance with the controlling Federal rules of statutory construction.

It is clear that this case was charged under the Assimilative Crimes Act, tried on that premise, and will be so considered by us. United States v Picotte, 12 USCMA 196, 30 CMR 196; United States v Wright, 12 USCMA 202, 30 CMR 202; and United States v Harkcom, 12 USCMA 257, 30 CMR 257. Under the specific language of the specification and the premise upon which the case was tried, we are not free to disregard the references to the state statute as surplusage and to consider the case as one involving only discredit upon the armed forces, in violation of Article 134, as contended by appellee.

We now proceed to consider whether the facts in this case are sufficient, as a matter of law, to sustain a conviction under the terms of the North Carolina statute, quoted above, which has been assimilated into the Federal statutes.

Appellate defense counsel call attention to the "only two reported cases involving this point in the United States that counsel have been able to find." Behrens v State, 140 Neb 671, 1 NW2d 289 (1941); and People v Green, 96 Cal App 2d 283, 215 Pac 2d 127 (1950). In *Behrens,* the victim jumped from the vehicle and a majority of the court held that her death had not resulted from an "accident" within the meaning of the Nebraska statute, there being no evidence that the young woman had hit the car in any manner. A dissent in that case adopted the theory that there had been a constructive ejection from the car as the actions of the driver had forced her to jump and therefore the manner in which he had driven the car was the cause of the injury.

310

In *Green* the victim jumped from the car after having been severely beaten by the other occupants and the court held this to be an "accident."

In both of these cases, however, there was not only a failure to render aid to the victim but primarily and basically a failure to stop, which latter issue is not present in the case at bar. And, for the purpose of this trial, this is a Federal not a state case. See United States v Press Publishing Co., 219 US 1, 55 L ed 65, 31 S Ct 212 (1911), and Johnson v Yellow Cab Transit Co., supra. "[T]he Assimilative Crimes Act does not make the Arizona Code applicable to the facts of this case." Williams v United States, supra.

"The Act, however, does not generally adopt state procedures. Indeed state interpretation of the adopted statutes is not binding upon a federal court [citing Johnson, supra], and federal, rather than state, rules of evidence are applicable to all prosecutions under the Act." Kay v United States, 255 F2d 476 (CA 4th Cir) (1958), cert den 358 US 825, 3 L ed 2d 65, 79 S Ct 42 (1958).

In any event, as noted above, no decisions of the court of North Carolina have been found on this particular point.

It has been the rule that penal statutes are to be construed strictly. Chief Justice Marshall, in The United States v Wiltberger, 5 Wheat 76 (US 1820), said, "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. [However] . . . they are not to be construed so strictly as to defeat the obvious intention of the legislature. . . . The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction." See Yates v United States, 354 US 298, 1 L ed 2d 1356, 77 S Ct 1064 (1957). "In construing a statute, penal as well as others, we must look to the object in view, and never adopt an interpretation that will defeat its own purpose, if it will admit of any other reasonable construction." The Emily

and The Caroline, Broadfoot, Claimant, 9 Wheat 381 (US 1824). See also Fields v United States, 164 F2d 97 (CA DC Cir) (1947), cert den 332 US 851, 92 L ed 421, 68 S Ct 355 (1948).

A strict construction of the North Carolina statute requires that we particularly take notice of a significant difference between that statute and the similar statutes of Nebraska and California. In the latter two, the law refers only to accidents; while in North Carolina, the code was amended in 1953 to add the words "or collision" at several places in this section as a further description of those events on which the obligation, provided by the statute, arises. Since a collision necessitates a contact or touching it is only reasonable to presume that it was the "obvious intention of the legislature," by this addition, to include any incidents involving the operation of an automobile other than collision within the meaning of the word accident. Since "the object in view" is to "prevent the victim from being left to suffer or die without timely aid" any other construction would do violence to the law. It is clear beyond cavil that by this amendment the legislature intended that these sections of the code have general application to all sorts of motor vehicle incidents and not to be limited only to those in which there is a striking of another person or property. If, as apparently held in the Nebraska case cited above, physical contact between the vehicle and a person or property is an essential element of the offense, it can no longer be so viewed within the framework of the amended code of North Carolina. Rather it is sufficient if the injury is in someway connected with the operation of the vehicle.

We have no doubt, for example, of the applicability of this statute to a situation in which the driver of an automobile suddenly pulls off the roadway on to the shoulder causing a bicyclist to swerve into a ditch with resulting injury to his person. Although there be no physical contact between the car and the bicycle or the person injured, there is clearly an "accident" in which

**311**

a person is injured. As noted from a careful reading of the statute, while the driver of an automobile is required to give his name and pertinent additional data to the person struck or the driver or occupants of the vehicle collided with, he is required to give assistance to *any* person injured. This, we think, is the crux of this section of the statute; the reference to *any* person. It eliminates the need for finding that the injured person was struck or was the driver or occupant of the vehicle collided with.

A six-year-old child who fell from a moving automobile was held to have died as the result of an "accident" in State v Independent Life Ins. Co. of America, 170 Tenn 105, 92 SW2d 407 (1936).

In Wright v Aetna Life Ins. Co., 10 Fed 2d 281 (CA 3d Cir) (1926), deceased fell or jumped from a car while it was out of control. Athough the car was brought under control without incident, the court held that Wright's "injury was suffered from an accident."

Where petitioner alleged that there was no contact between his car and the truck the court held that "if petitioner opened the door of his vehicle in such a manner as to affect in any way the operation of the other vehicle, he is 'involved' in the accident. This involvement would exist even if all the negligence were elsewhere and the petitioner not at all negligent." Baker v Fletcher, 191 Misc 40, 79 NYS2d 580 (1948).

In none of the above-cited cases was there any evidence of a touching of or striking by the automobile as would be necessary under the Nebraska interpretation.

Going beyond the question of physical contact between the vehicle and the injured person, the accused contends that under the statute the word "accident" includes only a fortuitous event, one that is not designed or intended; hence, since there is evidence that Mrs. Rowe jumped from the vehicle, which was a volitional or deliberate act, the event did not fall within the operation of the statute. The cases we have cited indicate that the word "accident" has a broader effect than urged by the accused. As in the Wright v Aetna Life Ins. Co. case, supra, a person who jumps from a moving vehicle can properly be considered as being involved in an "accident" in relation to the operation of the vehicle.

We conclude that the facts in this case come within the provisions of the North Carolina statute.

Whether Rowe was guilty of a failure to render "reasonable assistance" to "any person injured" turned on a question of fact and was submitted to the court by the law officer under proper instructions. After correctly listing the elements of the offense, the law officer said:

". . . What is required in this connection is that the accused know that she was injured, and that it was apparently necessary to him, from the nature of her injuries, that she be given reasonable assistance, and that she be carried to a physician or surgeon for medical or surgical treatment. . . . Further, with respect to Charge II, the duty to render assistance, including carrying the victim to a physician or surgeon arises at the time of the accident, not at any indefinite time thereafter."

Inasmuch as the court-martial weighed the evidence before it and settled the factual issue, we are in no position to overrule that decision in the absence of errors of law. United States v McCrary, 1 USCMA 1, 1 CMR 1.

Apparently the wording of the statute and the specification as drafted, were persuasive on the court despite the fact that Commander Steen, who performed the autopsy on the deceased, testified that, in his opinion, even with treatment "she could [not] have been saved."

Turning to another aspect of Charge II, the accused contends the independent evidence is insufficient to justify the admission of an incriminating pretrial statement made by him. See United States v Smith, 13 USCMA 105, 32

CMR 105. Specifically, he claims the independent evidence does not show probability of the following elements of the offense: (1) that he was the driver of an automobile, (2) that he knew the motor vehicle was involved in an accident, (3) that a person was injured as a result of the accident, (4) that it was reasonably apparent to him the injured person required medical attention. The issue was thoroughly reviewed by the investigating officer before trial and at each stage of the proceedings thereafter. All rulings were adverse to the accused. We reach the same conclusion.

Mrs. Rowe and the accused were seen leaving the noncommissioned officers' club about 11:30 p.m. on March 9. The accused was assisting Sergeant Tucker who was "more or less dead weight" having earlier "passed out" from drink. The group walked in the direction of the parking lot. Tucker testified he recalled getting into the back seat of the accused's car which was about 200 yards from the club. The next morning all three were at the accused's house. Mrs. Rowe's shoes were on the driveway about a foot from the car, on the passenger side. There was type AB blood on the inside of the car and blood spots leading from the living room of the house to the master bedroom in which Mrs. Rowe's body was found. Mrs. Rowe had type AB blood. We have previously pointed out that the pillow on which her head rested was stained with blood. There is also medical testimony to the effect that the numerous bruises on Mrs. Rowe's body were the result of some "form of trauma, probably an automobile accident . . . [or] some form of accident where she would be going at a fair velocity, plus hitting something hard." A dark gritty substance which appeared around the abrasions on her hands and legs and on her dress was determined to be petroleum residue commonly found in asphalt and tar. Photographs of the surface of part of the route from the noncommissioned officers' club to the Rowe's house show a type of asphalt material. Finally, there is evidence from which it can reasonably be inferred that Mrs. Rowe could not drive a car. Considering these circumstances, it appears with reasonable probability that, while Mrs. Rowe and the accused were returning home by car, Mrs. Rowe was injured in some sort of an incident involving the car. It further appears that as a result she was rendered unconscious and suffered other injuries which made it apparent to the accused that she required medical treatment. There is, therefore, no merit in the accused's contention that the evidence, *aliunde* his oral statements, is insufficient to show the offense charged was probably committed.

Next, the accused maintains the law officer erred in admitting into evidence some photographs of Mrs. Rowe's body which were taken at the hospital after Dr. Johnson's examination. At trial, individual defense counsel objected to the admission of the photographs because they were irrelevant and inflammatory. The latter contention is reiterated here, and joined with the claim that the photographs do not "show what the condition of Mrs. Rowe was at or about the time she received the injuries." As to relevancy, the nature, the location and the number of the multiple injuries are clearly relevant to the question whether, in the language of the North Carolina statute, it was "apparent that . . . [medical] treatment . . . [was] necessary." The same issue made it appropriate to admit the photographs as a specific and detailed indication of the extent of the injuries, in view of the accused's pretrial statement to the investigating officer, Sergeant Jerabek, that when he awakened Sergent Tucker he told him that Mrs. Rowe "had jumped out of the car, but she only had a little nose bleed." United States v Thomas, 6 USCMA 92, 19 CMR 218.

Putting aside the absence of objection at trial, there is no merit in the argument there was insufficient showing that the condition of Mrs. Rowe was the same at the time the pictures were taken, as it was at the time of the accident. According to the evidence, the accident

**313**

occurred about midnight. The photographs were taken about 11:40 the next morning. The evidence shows that no material change was made in regard to her person or her clothing from the time the accused picked her up from the roadway to the time the photographs were taken. In short, the evidence compellingly indicates there was no substantial change in Mrs. Rowe's physical appearance or in her clothing. See United States v Hurt, 9 USCMA 735, 752, 27 CMR 3. Moreover, assuming we may take judicial notice that discolorations accompanying injuries of the kind suffered by Mrs. Rowe tend to worsen sometime after the injuries are actually inflicted, this circumstance would go to the weight, not to the admissibility, of the photographs. As a matter of fact, the matter was noted specifically by defense counsel in his final arguments. In part, he said "I would like for the court to bear in mind that we know from common experience that bruises, abrasions and such, do not appear nearly as obvious and as bad when first inflicted, as they do after a few hours." Also, the law officer instructed the court-martial that they were to consider the injuries to Mrs. Rowe, only for the "limited purpose" of determining whether they indicated to the accused the need for medical attention for her.

Finally, the accused challenges the validity of the post-trial review on two grounds. First, he contends the staff legal officer was disqualified from participating in the review, because he had, in his pretrial advice, recommended to the convening authority that he disregard the Article 32 investigating officer's recommendation against further prosecution of the accused because of the accused's superb record, and the fact that the death of his wife, whom he apparently loved, constituted sufficient grievous punishment. Disagreement with the recommendation of an investigating officer does not thereafter disqualify the staff legal officer from further participation in the case. He is required by Article 34 of the Uniform Code to make an independent evaluation of all the circumstances of

**314**

the case, and his official recommendation in the pretrial advice does not, in the absence of evidence of bias or fraud, disqualify him from participating in the post-trial review. See United States v Haimson, 5 USCMA 208, 219–221, 17 CMR 208.

Going beyond the fact of mere disagreement between the staff legal officer and the Article 32 investigating officer, the accused contends the legal officer so "distorted, enlarged and definitely slanted the evidence . . . in a studied effort" to influence the convening authority to disregard the former's recommendation, as to "assume the role of an advocate," and thereby disqualify himself from later participation in the post-trial review. We need not catalog all the alleged distortions in the staff legal officer's pretrial advice. One item will suffice to show why we find the entire claim unfounded. The complaint concerns a statement by the staff legal officer that "there was a Naval hospital only a few blocks away" from the place of the accident. The accused says it "would be most interesting if the staff legal officer had stated where he got this information from the record." The investigating officer's report shows numerous references to the station hospital. Apart from that, the staff legal officer could properly take notice of matters within the common knowledge of the command. The geographic location of familiar military facilities within the command is a matter which may be properly noticed. United States v Jones, 2 USCMA 80, 87, 6 CMR 80.

The staff legal officer is also charged with partisan distortions of the evidence in the post-trial review. Here, too, the bill of complaint is a lengthy one. We need choose only a few examples to point out the lack of merit. The accused challenges the staff legal officer's description of his pretrial statement as constituting "essentially a confession." True, there are some exculpatory and self-serving expressions, such as the accused's representation that he told Sergeant Tucker that when he picked

up his wife from the roadway she had only a "little nosebleed." But, other parts of the statement, if believed, add up to a confession of guilt. In fact, the present argument makes meaningless the accused's earlier contention regarding the. rule requiring corroboration of a confession by independent evidence. Another complaint is, the staff legal officer said that the accused was the driver of the vehicle. "On what he based his opinion," says the accused, "he does not state." Our discussion of the sufficiency of the evidence to show probability of the commission of the offense shows the basis for the conclusion that the accused was the driver of the car. A similar analysis of the evidence for the same purpose was made by the staff legal officer; this analysis provides the justification for his conclusion. There is some strong language in the "clemency" section of the post-trial review about which the accused complains. Some of the language, such as the statement that only "a person out of his mind" would act as the accused did, may be injudicious, but it does not, by any standard, show bias or prejudice against the accused so as to destroy the impartiality of the post-trial review.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.